695 So.2d 70 (1995)
William BUSH
v.
STATE.
CR-90-1652.
Court of Criminal Appeals of Alabama.
December 1, 1995.
Order Overruling Application for Rehearing March 8, 1996.
*80 Stephen R. Glassroth, Montgomery, and James R. Seale, Montgomery, for Appellant.
Jeff Sessions, Atty. Gen., and Randall McNeill, Asst. Atty. Gen., for Appellee.
PATTERSON, Judge.
The appellant, William Bush, was indicted on September 11, 1981, in a four-count indictment for the capital offense of murder of Larry Dominguez during a robbery in the first degree or an attempted robbery in the first degree, see Ala.Code 1975, § 13A-5-40(a)(2). Each count of the indictment alleges the same offense based on the same facts, but each is worded slightly differently, and two counts include alternative allegations of attempted robbery. The appellant was convicted on November 18, 1981, after a jury trial, of the capital offense charged and, following a unanimous recommendation by the jury that the sentence be death, the trial court sentenced the appellant to death. On appeal, this court and the Supreme Court of Alabama affirmed the conviction and sentence. Bush v. State, 431 So.2d 555 (Ala.Cr. App.1982) (Bush I), aff'd, 431 So.2d 563 (Ala.), cert. denied, 464 U.S. 865, 104 S.Ct. 200, 78 L.Ed.2d 175 (1983).
Subsequently, the appellant filed a petition for writ of habeas corpus in the United States District Court for the Middle District of Alabama and, on March 19, 1984, pursuant to a stipulation between the state and the appellant, the federal court ordered that the writ be granted unless the state granted the appellant a new trial within 180 days. Bush v. Smith, Civil Action No. 83V-1438-N, U.S.Dist.Ct., Middle Dist. of Ala., Northern Division.[1]
*81 A new trial was held on the same four count indictment. It began on May 14, 1984, and culminated with a jury verdict on May 16, 1984, finding the appellant guilty of the capital offense as charged in the indictment. After the jury returned an advisory verdict of death, by a vote of 11 to 1, the trial court sentenced the appellant to death. On appeal, we reversed the judgment and remanded the case for a new trial on the ground that the trial court's jury instruction in the guilt phase indicating that the trial court had made a preliminary finding that the appellant's confession was voluntary and that the jury could not disregard that finding constituted plain error. Bush v. State, 523 So.2d 538 (Ala.Cr.App.1988) (Bush II), cert. denied, 523 So.2d 538 (Ala.1988).
A third trial was ordered on the same fourcount indictment; it began on January 28, 1991, and culminated in a jury verdict of guilty of the capital offense charged in the indictment on February 1, 1991. On the same date, the jury, after a separate sentencing hearing, unanimously recommended that the appellant be sentenced to life imprisonment without the possibility of parole. The trial court then held a second sentencing hearing and sentenced the appellant to death. The appellant appeals from this third conviction and his sentence of death, raising 24 issues. We will address the issues in the order that they appear in the appellant's brief. A rendition of the facts is necessary to an understanding of these issues.
The state presented evidence showing that around 3:00 a.m., on July 26, 1981, the appellant and a companion, Edward Lewis Pringle,[2] entered the Majik Market convenience store on Carter Hill Road in Montgomery, Alabama, with the intent to rob the cashier of money to buy drugs. When they entered, two people were in the store: Larry Dominguez, the store clerk, and his friend Tony Holmes. Dominguez was in the restroom. The appellant pointed a pistol at Holmes and forced him toward the restroom at the rear of the store. When Dominguez opened the restroom door, the appellant shot both Dominguez and Holmes. The appellant then returned to the front of the store and attempted unsuccessfully to open the cash register. Dominguez stumbled out of the restroom, and the appellant shot him again. Before departing, the appellant took two bags of "zodiac sign tags" from a rack behind the counter near the cash register. The first shot striking Dominguez passed through his chin, lodging in his neck and severing a large artery. The second shot striking Dominguez entered his right shoulder and passed through his lungs and heart. He died quickly at the scene from the injuries caused by the second shot; however, the injuries sustained as a result of the first shot were potentially fatal. Holmes was shot in the throat and, although seriously injured, he survived. He was able to describe his assailant, the pistol, and the automobile the assailants were driving. He described the automobile as a 1973 white-over-green Chevrolet Monte Carlo and the pistol as a nickel-plated.38 caliber short-barreled special.
After leaving the Majik Market, the appellant and Pringle drove to a nearby Seven-Eleven convenience store on Narrow Lane Road in Montgomery, arriving there sometime before 4:00 a.m. The appellant entered the store and purchased a package of Kool cigarettes from the clerk, Thomas Adams. After Adams opened the cash register, the appellant forced him into an office area behind the counter and shot him in the neck with the same pistol he had used to shoot Dominguez and Holmes.[3] The shot to *82 Adams's neck shattered his spinal cord and killed him instantly. When the shot was fired, the barrel of the pistol was either touching Adams's neck or within a fraction of an inch of it. The appellant took between $20 to $30 from the cash register, along with a bank bag and checks.
The appellant made a statement to the police in which he confessed to the crimes. Although in his first statement he claimed that Pringle was the triggerman in both shootings at the Majik Market and that he was the triggerman in the collateral capital offense at the Seven-Eleven store, in his second statement, he admitted that he fired the shots that killed Dominguez and Adams and that wounded Holmes. In assisting the officers in recovering the weapon, the appellant said to Officer R.T. Ward, when the pistol was recovered, "[T]hat's the weapon that was used to shoot all three people." Ballistic tests of the pistola nickel-plated.38 caliber short-barreled specialproved that it was the pistol that fired the shots in the commission of the three crimes.
For a more detailed recitation of the facts and circumstances surrounding the commission of the crimes and the appellant's involvement, see Bush II, 523 So.2d at 542.
The appellant did not testify at the guilt phase or at the sentencing phase of his trial. He offered no evidence in his defense at the guilt phase. He presented four witnesses at the sentencing phase before the jury, who testified to matters in mitigation of sentence, and he introduced letters that he had written and drawings that he had done while in prison.
It is apparent from the arguments of the appellant's trial counsel, the cross-examination of the state's witnesses, and the assertions made in the appellant's brief that his defense theory was mistaken identity. In furtherance of this theory, he sought to bolster Holmes's identification of Edward Pringle's brother, Cornelius Pringle, as the robber-assailant. He also points out that a number of fingerprints were lifted from the scene of the charged crime and that none matched his. He attempted to discredit the testimony of Patricia Pringle, the wife of Edward Pringlethat her husband had told her that he and the appellant had committed the three crimes and that the appellant had told her that he had shot Dominguez, Holmes, and Adamsby showing that she had received reward money for furnishing that information to the authorities. Finally, he attempted to discredit his incriminating statements by attempting to make it appear that the statements were obtained by coercion and in violation of his rights under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
In regard to the appellant's focus on Holmes's identification of Cornelius Pringle from a photographic lineup and from a live lineup, the record shows that the severe injuries suffered by Holmes may have affected his recollection of the events and his reasoning. The officers were skeptical of Holmes's identification of Cornelius Pringle from the beginning because he had difficulty communicating with them for days after he was shot and because they suspected that, in addition to the problems caused by his being shot in the face, he was mentally retarded, which proved to be the case. We are compelled to note, however, that we find that any disabilities resulting from his injuries and his stay in the hospital's intensive care unit and from his mental retardation do not cast doubt on his accurate descriptions of the getaway car and the pistol. Based on Holmes's description of the getaway vehicle, a BOLO was broadcast, and an automobile matching that description was found parked at Edward Pringle's residence at approximately 5:30 a.m. on the morning that the three crimes were committed. The motor was still warm. This automobile ultimately proved to be the getaway vehicle driven by the appellant and Edward Pringle in committing the three crimes. Holmes's description of the pistol also proved to be accurate. These descriptions were given *83 shortly after the police arrived at the scene and thus were not subjected to the influences arising from the passage of time as was his identification of Cornelius Pringle as the assailant.
In regard to the appellant's attempt to discredit his two incriminating statements, the appellant states in the recitation of the facts in his brief that his interrogation was conducted at night, in a small room, over a period of approximately six hours, while he was handcuffed to a chair. He further states that he was refused a request for an attorney and that he was physically abused and threatened during the interrogation. The statements were tape-recorded, the recordings were played to the jury at the trial, and the recordings are a part of the record.
This issue of the voluntariness of the two statements arose in the second trial of this case and, after suppression hearings, the trial court found against the appellant's contentions and admitted the statements into evidence. In the trial of the case now before us, a suppression hearing was also held on the question of admissibility of the two statements. The issue was submitted to the trial court by the appellant on the record of the suppression hearings held during the second trial. The evidence presented by the state at the suppression hearings during the second trial consisted of the testimony of two officers who conducted the interrogations, the transcripts of the tape recordings of the two statements, the tape recording of the second statement, and the post-interrogation photographs of the appellant, which show that he had not been abused or mistreated and that he was alert. The evidence presented by the state disclosed that before each interrogation, the appellant was advised of the charges against him, was given proper Miranda warnings, acknowledged that he understood his rights, expressly waived those rights, agreed to make statements about his participation in the three crimes, acknowledged that no promises had been made to him and that he had not been threatened or pressured in any way, and acknowledged that he was not under the influence of alcohol during the interrogation. The reasons given by the appellant for making the statements were plausible. The tape-recorded statements themselves reflect spontaneity, cooperation by the appellant, and voluntariness.
We addressed the admissibility of the statements in Bush II and found that the appellant did not assert his right to remain silent, that the statements were not obtained by physical force or threats thereof or by psychological coercion, and that his statements were knowingly and voluntarily made with proper Miranda warnings and, thus, that they were admissible into evidence. Bush II, 523 So.2d at 549-57. We have reviewed the record of the suppression hearings, have again viewed the post-interrogation photographs of the appellant, and have listened to the two tape-recorded statements, and we reaffirm and adopt our previous holding that the statements were knowingly and voluntarily made after proper Miranda warnings. The allegations in the appellant's brief that his statements were obtained by threats and abuse are not supported by the record. Bush II, 523 So.2d at 549-557. The trial court properly denied the motion to suppress the appellant's statements.

I.
The appellant contends that the trial court relied on an incorrect legal standard in finding the existence of the aggravating circumstance that the charged capital offense was especially heinous, atrocious, or cruel when compared to other capital offenses, § 13A-5-49(8), and that the court based its finding on insufficient evidence. He argues that the trial court improperly considered this circumstance in overriding the jury's recommendation of life imprisonment without the possibility of parole. The appellant argues this aggravating circumstance applies only to those murders where the assailant purposely causes an unusual and unnecessary amount of pain or torture to the victim before death. He cites in support of his argument Ex parte Kyzer, 399 So.2d 330, 334 (Ala.1981), in which the Alabama Supreme Court held that for the crime to fit within the especially heinous, atrocious, or cruel circumstance, it must be one of "those conscienceless or pitiless homicides which are unnecessarily torturous to the victim." He argues *84 that because Dominguez died almost instantly in an execution-type killing and allegedly did not suffer unnecessary pain and torture, it was improper for the trial court to find the existence of this aggravating circumstance.
We first note that the trial court rendered the sentence of death with its consideration of this aggravating circumstance and, in the alternative, without consideration of this circumstance. The trial court, as reflected by its sentencing order, found the existence of two additional aggravating circumstances: the appellant was previously convicted of the offense of robbery in March 1970 (§ 13A-5-49(2)); and the charged capital offense was committed while the appellant was engaged in or was an accomplice in the commission of a robbery (§ 13A-5-49(4)). The trial court stated in its sentencing order that "even without the inclusion of the aggravating circumstance that the crime was especially heinous, atrocious, or cruel compared to other capital offenses, the remaining aggravating circumstances outweighed the mitigating circumstances."
While the appellant correctly points out that we have upheld findings of the existence of the aggravating circumstance that the crime was especially heinous, atrocious, or cruel in cases where the victim suffered unnecessary torture, he ignores the line of cases holding that execution-type slayings evincing a cold, calculated design to kill fall into the category of especially heinous, atrocious, or cruel. See, e.g., Ex parte Rieber, 663 So.2d 999 (Ala.1995); Wright v. State, 494 So.2d 726, 743-44 (Ala.Cr.App.1985), aff'd, 494 So.2d 745 (Ala.1986), cert. denied, 479 U.S. 1101, 107 S.Ct. 1331, 94 L.Ed.2d 183 (1987).
In fact, the precise issue raised by the appellant here was raised in the first trial, and in Bush I, where in affirming that sentence, we specifically held:
"[F]or the reasons set out by the trial court, this capital offense was especially heinous, atrocious or cruel when compared to other capital offenses. Execution-type slayings evincing a cold, calculated design to kill, fall into the category of heinous, atrocious or cruel. Vaught v. State, 410 So.2d 147 (Fla.1982); Combs v. State, 403 So.2d 418 (Fla.1981); Armstrong v. State, 399 So.2d 953 (Fla.1981); Alvord v. State, 322 So.2d 533 (Fla.1975), cert. denied, 428 U.S. 923, 96 S.Ct. 3234, 49 L.Ed.2d 1226 (1976). We recognize that an instantaneous death caused by gunfire is not ordinarily a heinous killing. Odom v. State, 403 So.2d 936 (Fla.1981). However, when a defendant deliberately shoots a victim in the head in a calculated fashion to avoid later identification, after the victim has already been rendered helpless by gunshots to the chest, such `extremely wicked or shockingly evil' actions may be characterized as especially heinous, atrocious or cruel. Hargrave v. State, 366 So.2d 1, 5 (Fla.1978)."
431 So.2d at 560-61. In reviewing our opinion in Bush I, a portion of which is quoted above, the Alabama Supreme Court stated, "We concur with the appellate court's conclusion that Bush's death sentence was properly arrived at and is appropriate." Ex parte Bush, 431 So.2d at 565. See also Ex parte Rieber (quoting Bush I with approval in upholding the trial court's finding that the execution-type killing of the victim was especially heinous, atrocious, or cruel).
In this case, the trial court in its sentencing order made the following findings in reference to this aggravating circumstance:
"The Court does find from the evidence presented during the 1991 trial, which this Court has carefully considered, that the capital offense was especially heinous, atrocious or cruel compared to other capital offenses. This finding is based upon the evidence at trial that Larry Dominguez had already been shot and was stumbling or staggering out of the restroom when the Defendant shot him again. The evidence at trial was that the murder was committed so that the Defendant could eliminate an eyewitness to the robbery.
"The Court finds from the evidence presented that William Bush deliberately shot Larry Dominguez in the head in a calculated fashion to avoid later identification after the victim had already been critically wounded. As previously noted, the killing of Larry Dominguez was an execution-type killing and was followed within approximately *85 one hour by another murder of the same nature.
"The Court is constrained to find from the evidence that this act was extremely wicked and shockingly evil."
The evidence surrounding the charged capital offense supports the trial court's findings that the killing of Dominguez was an execution-type killing where the appellant "deliberately shot Larry Dominguez in the head in a calculated fashion to avoid later identification after the victim had already been critically wounded." Moreover, the appellant admitted to Patricia Pringle, the wife of the accomplice Edward Pringle, that the killing was an execution-type killing. She testified that when she asked the appellant why he had shot the three victims, he said, "[B]ecause [I] couldn't have anybody looking." We concur in the finding of the trial court that the capital offense for which the appellant was convicted was especially heinous, atrocious, or cruel when compared to other capital offenses. The record fully supports this finding. We adopt and reaffirm our prior holding in Bush I on this issue.
In further contesting the trial court's finding that the charged capital offense was especially heinous, atrocious, or cruel, the appellant contends that the trial court improperly considered his involvement in the subsequent, collateral murder of Thomas Adams during the robbery at the Seven-Eleven store. He argues that the subsequent collateral crime was unrelated to the killing of Dominguez and that the admission of evidence pertaining to that collateral crime violated the general exclusionary rule, which prohibits the introduction of evidence of crimes not charged in the indictment.
Evidence of any offense other than that specifically charged is prima facie inadmissible. Nicks v. State, 521 So.2d 1018 (Ala.Cr.App.1987), aff'd, 521 So.2d 1035 (Ala.), cert. denied, 487 U.S. 1241, 108 S.Ct. 2916, 101 L.Ed.2d 948 (1988). However, evidence of collateral crimes or bad acts is admissible as part of the prosecutor's case if the defendant's collateral misconduct is relevant to show his guilt other than by suggesting that he is more likely to be guilty of the charged offense because of his past misdeeds. Nicks v. State; Brewer v. State, 440 So.2d 1155 (Ala.Cr.App.1983); C. Gamble, McElroy's Alabama Evidence, § 69.01(1) (4th ed. 1991). Before its probative value will be held to outweigh its potential prejudicial effect, the evidence of a collateral crime must not only be relevant, it must also be reasonably necessary to the state's case, and it must be plain and conclusive. Averette v. State, 469 So.2d 1371 (Ala.Cr.App.1985). If evidence of the accused's commission of another crime is admissible, the state may prove in meticulous detail the manner in which the accused committed such other crime. Nelson v. State, 511 So.2d 225, 234 (Ala.Cr.App.1986), aff'd, 511 So.2d 248 (Ala. 1987), cert. denied, 486 U.S. 1017, 108 S.Ct. 1755, 100 L.Ed.2d 217 (1988); Weatherford v. State, 369 So.2d 863 (Ala.Cr.App.), cert. denied, 369 So.2d 863 (Ala.), cert. denied, 444 U.S. 867, 100 S.Ct. 141, 62 L.Ed.2d 91 (1979); McElroy's, § 69.02(8). The generally recognized exceptions to the general exclusionary rule, or tests for relevancy, whereby evidence of collateral crimes or acts may be admitted are as follows:
"(1) Relevancy to prove physical capacity, skill, or means to commit the now-charged crime; (2) part of the res gestae or part of a continuous transaction; (3) relevancy to prove scienter or guilty knowledge; (4) relevancy to prove criminal intent; (5) relevancy to prove plan, design, scheme, or system; (6) relevancy to prove motive; (7) relevancy to prove identity; (8) relevancy to rebut special defenses; and (9) relevancy in various particular crimes."
Nelson v. State, 511 So.2d 225, 233 (Ala.Cr. App.1986); Twilley v. State, 472 So.2d 1130 (Ala.Cr.App.1985). All of the exceptions relate to the relevancy of the evidence, which means that evidence of separate and distinct crimes is admissible only when the evidence is relevant to the crime charged. Mason v. State, 259 Ala. 438, 66 So.2d 557 (1953); Nicks v. State. If the evidence is not so remote as to lose its relevancy, the decision to allow or to not allow evidence of collateral crimes or acts as part of the state's case rests in the sound discretion of the trial court. McGhee v. State, 333 So.2d 865 (Ala. Cr.App.1976).
*86 The state argues that the evidence of the collateral capital crime was admissible under three exceptions to the general exclusionary rule: part of the res gestae or continuing transaction, relevant to motive, and relevant to identity. The trial court admitted the evidence of the collateral crime over the appellant's objection without giving a reason for its ruling.
We hold that the evidence of the collateral capital offense was admissible as part of the res gestae of the charged capital offense. The two crimes are intertwined and connected to such an extent that they form one continuous transaction. McElroy's, § 70.01(24)(b), in regard to the res gestae exception, states "Prior and subsequent criminal acts of the defendant are admissible in a robbery prosecution if such crimes fall within the res gestae of the now charged crime. This is sometimes referred to as the `one continuous transaction' exception to the general exclusionary rule." (Citations omitted.) The record discloses that the appellant and Edward Pringle entered the Majik Market store with the intent to rob its cashier in order to get money to buy drugs and that the appellant, after shooting Dominguez and Holmes, was unable to get into the cash register. Failing in their effort to get money at the Majik Market convenience store, they immediately drove to a nearby Seven-Eleven convenience store and, within an hour, entered that store with the same purpose in mind, i.e., to obtain money to buy drugs. After killing the cashier, they took approximately $30 from the cash register, along with a bank bag and checks. The second crime was obviously committed because the appellant and Pringle had failed in their efforts to get money in the commission of the first capital murder crime.
Upon this evidence, we also hold that the evidence of the collateral capital crime was admissible under the intent and motive exceptions to the general exclusionary rule. The appellant's motive and intent in committing the charged capital offense at the Majik Market were brought into question by the appellant's claim that the state's evidence was insufficient to prove that the murder was committed during the course of a robbery. He argues that because his theft of the zodiac sign tags was allegedly an afterthought and occurred after the shootings and while the appellant was fleeing the scene, the murder was not committed in the course of the commission of a robbery. Because the appellant's motive and intent when he entered the store and shot Dominguez and Holmes were called into question, his subsequent actions in the Seven-Eleven store were relevant in proving his intent and motive in committing the charged offense.
Because the evidence of the collateral capital crime was admissible against the appellant as part of the whole criminal scheme, and as relevant to prove identity and motive, the trial court did not err in considering the evidence of the collateral crime in finding that the charged crime was especially heinous, atrocious, or cruel when compared to other capital offenses.

II.
The appellant contends that because he allegedly was not given notice of the state's intention to rely on the aggravating circumstances that the crime was especially heinous, atrocious, or cruel, § 13A-5-49(8), and that the defendant had previously been convicted of another capital offense or a felony involving the use or threat of violence to the person, § 13A-5-49(2), the trial court erred in instructing the jury to consider them and also in considering those aggravating circumstances. He contends that this failure of the state to give him notice denied him due process.
Before trial, the appellant moved to prohibit the state from relying on the aggravating circumstance that the crime was especially heinous, atrocious, or cruel, and the prosecutor responded that he did not intend to rely on that aggravating circumstance. The trial court did not rule on the appellant's motion.
The following exchange occurred at the beginning of the sentencing hearing before the jury:
"THE COURT: I think there are just really three possible aggravating circumstances.

*87 "MR. BELSER [prosecutor]: As one of the aggravating circumstances we intend to offer certified copies of a prior 1970 robbery conviction.
"THE COURT: You've got that one; and you've got the commission of murder during a robbery, and you've got another, heinous and atrocious
"MR. GLASSROTH [defense counsel]: Of course, the defense is going to object and wants to make a record on heinous, atrocious, and cruel.
"THE COURT: Well, you asked for instruction on it.
"MR. GLASSROTH: That's if the Court is going to charge on heinous, atrocious and cruel. We object but without waiving the objection we will submit a charge, if the Court is of mind.
"THE COURT: You've already submitted a charge.
"MR. GLASSROTH: Yes, sir. I will withdraw it if the Court is not going toif my withdrawal would result in the Court not charging on it."
At no time did the appellant object to the consideration and finding of these aggravating circumstances on the ground that he had not received notice of the state's intention to rely upon them. In fact, no objection of any kind was raised in the trial court as to the aggravating circumstances in § 13A-5-49(2).
Because no objection was lodged on the ground of lack of notice, we must review this issue under the plain error rule. In considering what constitutes plain error in a capital case, we have adhered to the interpretation of the term "plain error" adopted by the Alabama Supreme Court, which follows the interpretation given that term by the federal courts. See Ex parte Harrell, 470 So.2d 1309 (Ala.), cert. denied, 474 U.S. 935, 106 S.Ct. 269, 88 L.Ed.2d 276 (1985); Ex parte Womack, 435 So.2d 766 (Ala.), cert. denied, 464 U.S. 986, 104 S.Ct. 436, 78 L.Ed.2d 367 (1983). See also Hooks v. State, 534 So.2d 329 (Ala.Cr.App.1987), aff'd, 534 So.2d 371 (Ala.1988), cert. denied, 488 U.S. 1050, 109 S.Ct. 883, 102 L.Ed.2d 1005 (1989). Plain error is error that has or probably has adversely affected a substantial right of the appellant, Ala.R.App.P. 45A, or is so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings. Ex parte Womack. The failure to object at trial weighs against any claim of prejudice an appellant may make. Kuenzel v. State, 577 So.2d 474 (Ala.Cr.App.1990), aff'd, 577 So.2d 531 (Ala.1991).
The aggravating circumstances enumerated in § 13A-5-49 that may lead to the imposition of the death penalty in a capital case are not elements of the offense and are not required to be set forth in the indictment. Dobard v. State, 435 So.2d 1338, 1347 (Ala.Cr.App.1982), aff'd, 435 So.2d 1351 (Ala. 1983), cert. denied, 464 U.S. 1063, 104 S.Ct. 745, 79 L.Ed.2d 203 (1984). A defendant has no right to advance notice of the state's intention to rely on any of the aggravating circumstances. Clark v. Dugger, 834 F.2d 1561, 1566 (11th Cir.1987), cert. denied, 485 U.S. 982, 108 S.Ct. 1282, 99 L.Ed.2d 493 (1988); Knotts v. State, 686 So.2d 431 (Ala. Cr.App.1985); Ruffin v. State, 397 So.2d 277, 282 (Fla.), cert. denied, 454 U.S. 882, 102 S.Ct. 368, 70 L.Ed.2d 194 (1981). The list of aggravating circumstances in § 13A-5-49 is exclusive and puts the defendant charged with a capital felony on notice of those circumstances against which the defendant may be required to defend. This statutory notice satisfies constitutional requirements.
In this case, because the aggravating circumstances that the crime was especially heinous, atrocious, or cruel, and that the appellant had previously been convicted of a felony involving the use or threat of violence to the person were relied upon and found to exist in the appellant's two previous trials, it certainly came as no surprise to the appellant that the trial court would instruct the jury to consider them and also that it would consider and find them in this third trial. The fact that the appellant had submitted a requested written instruction to the trial court on the aggravating circumstance that the crime was especially heinous, atrocious, or cruel shows that he anticipated and expected the consideration and possible finding of such aggravating circumstance.
The question does arise as to whether the prosecutor's representation before the *88 trial that the state would not rely on the aggravating circumstance that the crime was especially heinous, atrocious, or cruel misled the appellant to his prejudice. Under the facts and circumstances here, we do not think so. Reliance by the appellant on the prosecutor's statement in the absence of a ruling or an understanding of the trial court would have been unreasonable. The appellant was aware at the beginning of the sentencing proceedings that the trial court would consider and instruct the jury on the aggravating circumstance in question. When the trial court indicated that it would consider the aggravating circumstance, the appellant did not seek a recess or a continuance or make any showing of what he would have expected to present had he been given any better notice. The appellant does allege in brief that he could have possibly presented expert testimony that the victim was dispatched quickly without pain to show that the crime was not especially heinous, atrocious, or cruel. However, such testimony would have been of little benefit to him in view of our holding in Part I that an execution-type killing is itself especially heinous, atrocious, or cruel as compared to other capital offenses.
We find no error, certainly no plain error.

III.
The appellant contends that the trial court erred in refusing and/or failing to consider "significant" mitigating evidence, both statutory and nonstatutory, in overriding the jury's unanimous recommendation that he be sentenced to life imprisonment without the possibility of parole and in sentencing him to death. He lists this alleged evidence as follows: The fact that he was "significantly impaired and disturbed" at the time he shot and killed Dominguez due to his use of "narcotic drugs"; his "minimal" education and "unusually low intelligence"; his confession to the police and his expressed remorse for the killing; his difficult childhood; his study of technical subjects that enabled him to be gainfully employed for several years; his "model" behavior during his years on death row; his spiritual conversion while on death row; his artwork; his family relationships; his worth as a human being; and the fact that his codefendant received a sentence of life imprisonment without parole sentence while the appellant received a death sentence. He contends that because of the trial court's failure or refusal to consider these mitigating circumstances, he is entitled to a new sentencing hearing before the trial court where the allegedly mitigating circumstances will be properly considered and weighed.
The appellant failed to raise any objection in the trial court to that court's sentencing order concerning its consideration and findings in reference to mitigating circumstances. Thus, we must review this issue under the plain error rule.
The trial court's sentencing order in reference to matters of mitigation is as follows:
"1. The Court finds from the evidence that William Bush does have a significant history of prior criminal activity in that he has been previously convicted of Robbery.
"2. The Defendant contends in a written statement that he was under the influence of narcotics at the time of the capital offense. The Court does not find from the evidence that the Defendant was under the influence of extreme mental or emotional disturbance.
"3. The Court finds that the victim, Larry Dominguez, was not a participant in Mr. Bush's conduct and did not consent to the act.
"4. The evidence establishes that the Defendant was a major participant in the capital offense and that the shootings were done by him. The evidence establishes that the Defendant shot with his own pistol the victims, Dominguez, Adams and Holmes.
"5. The Court finds from the evidence that Mr. Bush did not act under extreme duress or under the substantial domination of another person.
"6. The Court finds that the capacity of Mr. Bush to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was not substantially impaired. The Court finds from the evidence that the Defendant, William Bush, knew full well what he was doing *89 and that what he was doing was wrong. He stated to a witness that he shot the victims so that there would be no eyewitness to him criminality.
"7. The evidence establishes that the Defendant was thirty-one years of age at the time of the capital offense.
"8. In addition to the above enumerated mitigating circumstances the Defendant, at the sentence hearing conducted by the Court, was given an opportunity to present any other evidence of mitigating circumstances and to make any statement of mitigating circumstances. The Court heard testimony from family members that William Bush was a productive member of society and that while in prison he has shown remorse for his crime and that the life of William Bush is of value, which the Court finds to be a mitigating circumstance.
"9. The Court considers as a mitigating circumstance the evidence that William Bush has made a spiritual conversion during the last two years that has made a difference in his life. Defendant while in prison has done artwork which reflects his worth as a human being.
"10. The Court considers the advisory vote of the jury of twelve for life without parole and zero for death to be a mitigating circumstance."
After reviewing the record, we conclude that the trial court considered all matters offered in mitigation by the appellant and did not restrict the appellant in any manner in his presentation of evidence in mitigation. Although the trial court failed to find the existence of any enumerated statutory mitigating circumstance, it found the existence of several nonstatutory mitigating circumstances: that the appellant was a productive member of society, that he showed remorse for his crime while in prison, that his life is of value, that he had made a spiritual conversion during the last two years that has made a difference in his life, that he has done artwork while in prison that reflects his worth as a human being, and that the jury recommended a sentence of life imprisonment without the possibility of parole by a unanimous vote.
A sentencer in a capital case may not refuse to consider or be "precluded from considering" mitigating factors. Eddings v. Oklahoma, 455 U.S. 104, 110, 102 S.Ct. 869, 874, 71 L.Ed.2d 1 (1982) (quoting Lockett v. Ohio, 438 U.S. 586, 604, 98 S.Ct. 2954, 2964, 57 L.Ed.2d 973 (1978)). The capital defendant generally must be allowed to introduce any relevant mitigating evidence regarding the defendant's character or record and any of the circumstances of the offense, and consideration of that evidence is a constitutionally indispensable part of the process of inflicting the penalty of death. California v. Brown, 479 U.S. 538, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987); Ex parte Henderson, 616 So.2d 348 (Ala.1992); Haney v. State, 603 So.2d 368 (Ala.Cr.App.1991), aff'd, 603 So.2d 412 (Ala.1992), cert. denied, 507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993). Although the trial court is required to consider of all mitigating circumstances, the decision of whether a particular mitigating circumstance is proven and the weight to be given it rests with the sentencer. Carroll v. State, 599 So.2d 1253 (Ala.Cr.App.1992), aff'd, 627 So.2d 874 (Ala.1993), cert. denied, 510 U.S. 1171, 114 S.Ct. 1207, 127 L.Ed.2d 554 (1994). See also Ex parte Harrell, 470 So.2d 1309 (Ala.), cert. denied, 474 U.S. 935, 106 S.Ct. 269, 88 L.Ed.2d 276 (1985). Moreover, the trial court is not required to specify in its sentencing order each item of proposed nonstatutory mitigating evidence offered that it considered and found not to be mitigating. Morrison v. State, 500 So.2d 36 (Ala.Cr.App.1985), aff'd, 500 So.2d 57 (Ala.1986), cert. denied, 481 U.S. 1007, 107 S.Ct. 1634, 95 L.Ed.2d 207 (1987). Thus the trial court's failure to list and to make findings in its sentencing order as to all of the alleged nonstatutory mitigating circumstances offered by the appellant indicates only that it found the evidence not mentioned to be not mitigating, not that the evidence was not considered.
In more specific regard to the appellant's argument that the trial court refused and/or failed to consider as a mitigation that he was "significantly impaired and disturbed" at the time of the commission of the charged offense because of his use of "mind-altering" *90 drugs, we do not agree that the trial court refused or failed to consider the possibility that the appellant was using drugs at the time he committed the offense. The sentencing order shows that the trial court considered the appellant's contention that he was under the influence of narcotics at the time of the offense. From the trial court's findings that the appellant was not under the influence of extreme mental or emotional disturbance at the time of the commission of the offense, that his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was not substantially impaired, and that he knew "full well what he was doing and [that] what he was doing was wrong," it is obvious that the trial court considered the appellant's alleged use of drugs at the time of the offense and found that the evidence did not support a finding that it constituted a mitigating circumstance. We agree with this finding. The confessions of the appellant clearly show that he knew what he was doing and that he knew that it was wrong. Even assuming as true his allegations of his "shooting up" a "couple" of times that night on "speed" or "bam," the evidence was insufficient to show that he was so intoxicated or affected by the drugs that he was incapable of appreciating and controlling his conduct. He indicated that he was not a regular drug user. His rendition of the events of that evening is clear and concise. Moreover, he did not give drugs as the reason for the shootings. His reasons were to eliminate the possibility of witnesses and to "try to keep them from getting to a phone so [the appellant] could get away."
In more specific regard to the appellant's contention that the trial court refused and/or failed to consider as mitigation his alleged "unusually low intelligence," we have found nothing to factually support his allegation. Although he dropped out of school in the seventh grade, this is no indication of a low intelligence. We further note that he received "technical" education while serving time in a federal prison in Texas.
We find it noteworthy that, while the trial court found as a mitigating factor that while in prison the appellant had shown remorse for his crime, during the trials of this case, as we have previously stated, he contended that his confessions were obtained by coercion and he attempted to cast suspicion for commission of the charged crime on Cornelius Pringle, a person who has not been connected in any manner with the offense. We also note the following statement by the appellant during his sentencing hearing, when the court asked him if he had anything to say before his sentence was imposed:
"Yeah, I have a number of things to request of you, Judge, the Court. For the last 10 or 11 years I've been accused of this crime, robbery and murder. For the last 7 or 8 years I've been telling y'all I'm not guilty, I haven't did this crime. So, in other words, the only eyewitness in this case have came forward on several occasions and say I wasn't the one, he say he know who shot and robbed; but it also turned around he said that the District Attorney and the police said if he said Bush did this here, they'd get the reward money. The way I look at it, if this happened they know I'm not guilty, why do they keep on bringing the only eyewitness forward telling him to say I'm the one who did that, they will get the reward money. I'm not guilty. I'm innocent of this case."
The appellant's contention that the trial court should have found the fact that his accomplice was sentenced to life without the possibility of parole sentence to be a mitigating circumstance has no merit. The appellant was the confessed triggerman.
In summary, the appellant's contentions concerning the court's consideration and findings in reference to the mitigating circumstances do not rise to the level of plain error.

IV.
The appellant contends that the trial court erred in relying on his 1970 robbery conviction to prove the aggravating circumstance that "[t]he defendant was previously convicted of another capital offense or a felony involving the use or threat of violence to the person, § 13A-5-49(2)." He argues that the state failed to prove that the guilty plea underlying the conviction was knowingly and *91 voluntarily entered and that he was represented by counsel at the guilty plea proceedings.
We note that, in the prior two trials, the state relied on this prior conviction as an aggravating circumstance, that the state proved it in the same manner as it was proved in the third trial, and that the trial court found it to be an aggravating circumstance. No objection was ever made to the state's manner of proving this conviction in any of those prior proceedings, nor has the issue been raised in the prior appeals. When the court record was offered into evidence to prove the conviction in this case, the appellant did not object to its admission. Moreover, the appellant did not object to the trial court's instruction to the jury in the sentencing phase that it could consider in its deliberations the aggravating circumstance that "[t]he defendant has been previously convicted of a felony involving the use or threat of violence to the person." Finally, he did not object to the inclusion of the prior robbery conviction in the presentence report. Because this issue of the court's reliance on the appellant's prior robbery conviction was never raised in the trial court, it must be reviewed under the plain error rule. It is reasonable to conclude from the record that the appellant consented to the admission of the evidence of his prior conviction. We further note that the appellant's counsel even referred to the prior conviction when, in arguing to the jury in the sentencing phase, he stated, "A conviction in 1970, a debt that has been paid."
Section 13A-5-10.1, which pertains to the proof of prior felony convictions for enhancement under the Habitual Felony Offender Act, provides, "Certified copies of the case action summary sheets, docket sheets, or other records of the court are admissible for the purpose of proving prior convictions of a crime, if the prior conviction is otherwise admissible under the laws of this state." This has also been recognized as a proper method for proving a prior conviction to establish the existence of an aggravating circumstance in a capital case. See Jones v. State, 520 So.2d 543 (Ala.Cr.App.1984), aff'd, 520 So.2d 553 (Ala.), cert. denied, 488 U.S. 871, 109 S.Ct. 182, 102 L.Ed.2d 151 (1988); Cosby v. State, 627 So.2d 1059 (Ala.Cr.App.1993).
The appellant's contention that the court record of the 1970 robbery conviction fails to show that he was represented by counsel is without merit. The docket sheet shows that the appellant was represented by H. Perdue. Docket sheet entries recite that the appellant was represented by counsel at arraignment and at the guilty plea and sentencing proceedings. If the court document indicates that a defendant was represented by counsel, it is presumed that counsel was present at all critical stages of the proceedings. Section 13A-5-10.1(c).
The appellant's contention that the trial court should not have relied on his prior conviction because the state failed to prove that his guilty plea was knowingly and voluntarily entered is, likewise, without merit. Such an assertion amounts to a collateral attack on his 1970 robbery conviction. The proper forum for attacking the validity of the prior conviction would be by Ala.R.Cr.P. 32 post-conviction petition in the court of conviction. Ex parte Madden, 602 So.2d 1192 (Ala.1991); Johnson v. State, 541 So.2d 1112 (Ala. Cr.App.1989). Here, the trial court could not have looked beyond the facial validity of the conviction. In this case, the judgment of the Montgomery Circuit Court appears valid upon its face. It reflects that the circuit court had jurisdiction of the offense charged and the defendant, William Edward Bush. Proof of the conviction and proof that the appellant was represented by counsel at the time of the conviction were all that was required. In our opinion, the state met this burden and proved the conviction beyond a reasonable doubt.[4] We find no plain error in these contentions.

V.
The appellant contends that in overriding the jury's sentence recommendation, *92 the trial court considered "improper information" contained in the presentence report. He states that this "improper information" included "nonstatutory aggravating evidence" about his juvenile record. He does not identify any other portions of the presentence report that he considers improper.
The presentence report was prepared and filed in accordance with § 13A-5-5; § 13A-5-47(b); and Rule 26.3, Ala.R.Cr.P., and was considered by the trial court in determining the appellant's sentence. It shows two juvenile adjudications involving the appellant in 1965 and in 1968. The appellant cites Freeman v. State, 555 So.2d 196, 212 (Ala.Cr.App. 1988), aff'd, 555 So.2d 215 (Ala.1989), cert. denied, 496 U.S. 912, 110 S.Ct. 2604, 110 L.Ed.2d 284 (1990) to support his contention. However, his reliance on Freeman is misplaced. While the Freeman court correctly held that juvenile adjudications are not convictions or criminal in nature and cannot be considered to negate the statutory mitigating circumstance that a defendant has no significant history of prior criminal activity, § 13A-5-51(1), it did not address aggravating circumstances. In finding that this mitigating circumstance did not exist, the trial court did not rely on the juvenile adjudications, but rather correctly found that the appellant had a significant history of prior criminal activity in that he had been previously convicted of robbery. (The presentence report shows that the appellant also had prior convictions for larceny and for a violation of the federal firearms act.)
A trial court may consider only those aggravating circumstances listed in § 13A-5-49 in fixing the death penalty. Clisby v. State, 456 So.2d 99 (Ala.Cr.App.1983); Berard v. State, 402 So.2d 1044 (Ala. Cr.App.1981). In this case, the trial court found the existence of three statutory aggravating circumstances: (1) that the defendant had previously been convicted of the offense of robbery in March 1970; (2) that the capital offense was committed while the defendant was engaged in or was an accomplice in the commission of a robbery; and (3) that the capital offense was especially heinous, atrocious, or cruel when compared to other capital offenses. There is nothing in the record or in the sentencing order from which one could even infer that the trial court considered the appellant's juvenile record, as shown in the presentence report, as nonstatutory aggravating evidence. We, thus, find no merit to the appellant's contention. In the absence of some evidence to the contrary, we must presume that the trial court knew the law and that it correctly applied it in making its decision. Walton v. Arizona, 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990); Hutcherson v. State, 677 So.2d 1174 (Ala.Cr.App.1994).
We are convinced after reviewing the record that the trial court's use of the presentence report in determining the appellant's sentence was consistent with § 13A-5-45(d), which states:
"Any evidence which has probative value and is relevant to sentence shall be received at the sentence hearing regardless of its admissibility under the exclusionary rules of evidence, provided that the defendant is accorded a fair opportunity to rebut any hearsay statements. This subsection shall not be construed to authorize the introduction of any evidence secured in violation of the Constitution of the United States or the State of Alabama."
The appellant also contends that the presentence report includes "damaging" statements made by him during an "unwarned, uncounseled presentence interview" with the probation officer who prepared the report. He does not identify which statements he considers damaging. The cases of Powell v. Texas, 492 U.S. 680, 109 S.Ct. 3146, 106 L.Ed.2d 551 (1989), and Estelle v. Smith, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), relied upon by the appellant, are not applicable to this presentence report. In those cases, the Court held that a capital defendant's Fifth Amendment right against compelled self-incrimination precluded the state from subjecting him to a psychiatric examination concerning future dangerousness without first informing him (1) that he has a right to remain silent and (2) that anything he says can be used against him at a sentencing proceeding, and further that once a capital defendant is formerly charged, the Sixth Amendment right to counsel precludes *93 such a psychiatric examination without first notifying counsel that the examination will encompass an assessment of future dangerousness. It is apparent from the presentence report that the appellant was interviewed by the preparer of the report and that the information given was of a general background nature typically found of presentence reports. The presentence report shows that no psychological reports were considered, and it is readily apparent that no questions were asked by the interviewer and no responses made by the appellant that would bear in any way upon the question of the appellant's future dangerousness. The report is silent in this regard. It can only be concluded that future dangerousness was not a subject of the interview. We note that in the interview the appellant denied his guilt.
In conclusion, we have searched the presentence report and we find no improper information in it and certainly no damaging statements of the type referred to by the appellant and discussed in the cases cited. It meets the requirements of the applicable statutes and rule.
The appellant did not object to the presentence report when he was afforded an opportunity to do so at trial; he raises these objections for the first time on appeal. We have, therefore, reviewed his contentions under the plain error rule. We find no merit in these contentions, and certainly no plain error.

VI.
The appellant contends that § 13A-5-47(e), which provides as follows, is unconstitutional on its face.
"In deciding upon the sentence, the trial court shall determine whether the aggravating circumstances it finds to exist outweigh the mitigating circumstances it finds to exist, and in doing so the trial court shall consider the recommendation of the jury contained in its advisory verdict, unless such a verdict has been waived pursuant to section 13A-5-46(a) or 13A-5-46(g). While the jury's recommendation concerning sentence shall be given consideration, it is not binding upon the court."
He argues that the statute does not contain adequate standards or safeguards to guide the trial court in exercising its authority to override the recommendation of the jury and that because of this deficiency, it was unconstitutionally applied in this case.
The appellant's contention that the override provision of § 13A-5-47(e) is facially unconstitutional is without merit. The United States Supreme Court, as well as the courts of this state, have consistently upheld the validity of the judicial override of advisory jury verdicts. See, e.g., Harris v. Alabama, 513 U.S. 504, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995); Clemons v. Mississippi, 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990); Spaziano v. Florida, 468 U.S. 447, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984); Ex parte Jones, 456 So.2d 380 (Ala.1984), cert. denied, 470 U.S. 1062, 105 S.Ct. 1779, 84 L.Ed.2d 838 (1985); Freeman v. State, 555 So.2d 196 (Ala.Cr.App.1988), aff'd, 555 So.2d 215 (Ala.1989), cert. denied, 496 U.S. 912, 110 S.Ct. 2604, 110 L.Ed.2d 284 (1990). In this state, the recommendation of the jury is advisory only and is not binding upon the trial court. Ex parte Jones. The trial court, not the jury, is the sentencing authority. Freeman v. State.
Section 13A-5-47(e) prescribes the following standard of review for jury override, which standard meets constitutional requirements: "The whole catalog of aggravating circumstances must outweigh mitigating circumstances before a trial court may opt to impose the death penalty by overriding the jury's recommendation." Ex parte Jones, 456 So.2d at 382. The appellant's argument that the Alabama Death Penalty Act permits a trial court to impose a death sentence without any standards to guide its discretion is simply not true and ignores the requirements of the override provision.
The appellant argues that we should follow the Florida standard for jury override prescribed in Tedder v. State, 322 So.2d 908 (Fla.1975). Tedder provides that, in order for a trial court to reject a jury's recommendation of a sentence of life imprisonment without parole, "the facts suggesting a sentence of death [must be] so clear and convincing that virtually no reasonable person *94 could differ." Id. at 910. The Tedder standard is not constitutionally mandated, Harris v. Alabama; Ex parte Jones, and we have chosen not to read the Tedder standard into our death penalty statute.
What we do require is that, before sentencing a defendant to death, the trial court consider all the available evidence; hear arguments on aggravating and mitigating circumstances; enter written findings of fact summarizing the crime and the defendant's participation in it; make specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in § 13A-5-49, each mitigating circumstance enumerated in § 13A-5-51, and any additional mitigating circumstance offered pursuant to § 13A-5-52; consider and weigh the advisory verdict of the jury; consider and weigh the presentence investigation report; consider and weigh the mitigating and aggravating circumstances; and determine that the aggravating circumstances outweigh the mitigating circumstances. We believe that this scheme adequately channels the trial court's discretion so as to prevent arbitrary results. The Eighth Amendment does not require the state to define the weight the sentencing judge must accord an advisory verdict. Harris v. Alabama.
"[T]he sentencing authority in Alabama, the trial judge, has unlimited discretion to consider any perceived mitigating circumstances, and he can assign appropriate weight to particular mitigating circumstances. The United States Constitution does not require that specific weights be assigned to different aggravating and mitigating circumstances. Murry v. State, 455 So.2d 53 (Ala.Cr.App.1983), rev'd on other grounds, 455 So.2d 72 (Ala.1984). Therefore, the trial judge is free to consider each case individually and determine whether a particular aggravating circumstance outweighs the mitigating circumstances or vice versa. Moore v. Balkcom, 716 F.2d 1511 (11th Cir.1983). The determination of whether the aggravating circumstances outweigh the mitigating circumstances is not a numerical one, but instead involves the gravity of the aggravation as compared to the mitigation."
Clisby v. State, 456 So.2d 99, 102 (Ala.Cr. App.1983). We are convinced, after reviewing the record in this case, that the trial court complied with the sentencing scheme of Alabama's death penalty statute and that the sentence that it imposed, overriding the jury's verdict, met constitutional requirements and was not arbitrary, discriminatory, or fundamentally unfair.

VII.
The appellant contends that the trial judge erroneously denied the appellant's motion to recuse himself because the judge had presided over the appellant's previous two trials in which he ultimately sentenced the appellant to death. He asserts that because the trial judge had already sentenced the appellant to death twice, it was a foregone conclusion that the judge would again sentence the appellant to death despite the jury's unanimous advisory verdict recommending life imprisonment without the possibility of parole. This contention is not supported by the record.
"`A judge should not act "if he has any interest, the probable and natural tendency of which is to create a bias in the mind of the judge for or against a party to the suit." Morgan County Commission v. Powell, 292 Ala. 300, 311, 293 So.2d 830, 839 (1974).... A mere accusation of bias unsupported by substantial fact does not require disqualification of a judge. Taylor v. Taylor, 387 So.2d 849, 852 (Ala.Civ.App. 1980).' Ross v. Luton, 456 So.2d 249, 254 (Ala.1984). In this State, the general rule is that a judge is presumed to be qualified and unbiased, McMurphy v. State, 455 So.2d 924, 929 (Ala.Cr.App.1984), and the movant has a substantial burden in proving otherwise. Irby v. State, 429 So.2d 1179 (Ala.Cr.App.1983). `Evidence must be presented to prove the judge possesses a personal bias as opposed to one that is judicial in nature. Personal as opposed to judicial bias is characterized by an attitude of extrajudicial origin derived non coram judice.' Moreland v. State, 469 So.2d 1305, 1307 (Ala.Cr.App.1985). `Bias and prejudice must be shown by the conduct of the *95 trial judge and may not be presumed or inferred by his subjective views.' Hartman v. Board of Trustees of the University of Alabama, 436 So.2d 837, 841 (Ala.1983). `The appellant must present evidence to prove the personal bias of a judge, or else his motion cannot prevail.' Slinker v. State, 344 So.2d 1264, 1268 (Ala. Cr.App.1977). On appeal, the trial judge's refusal to recuse himself will not be reversed in the absence of clear evidence of bias or prejudice. Moreland, 469 So.2d at 1307.
"In McMurphy, 455 So.2d at 929, this court observed,
"`As stated by the Alabama Supreme Court in the case of In re Raines, 294 Ala. 360, 317 So.2d 559 (1975), "pretrial involvement or knowledge on the part of a trial judge does not necessarily create an unconstitutional risk [of] bias." Id., at 366, 317 So.2d 559....
"`....
"`... Nor is bias proved simply because the trial judge who presided at the second trial of defendant had also presided at his first trial and heard evidence later found to be inadmissible by an appellate court. Walker v. State, 38 Ala.App. 204, 84 So.2d 383 (1955).'
"This court has found no error in a trial judge's refusal to recuse himself in cases involving the retrial of a capital offense. Giles v. State, [554 So.2d 1073] (Ala.Cr. App.1984); Whisenhant v. State, 482 So.2d 1225, 1227 (Ala.Cr.App.1982), aff'd. in pertinent part, 482 So.2d 1241, 1245 (Ala.1983), rev'd on other grounds, 482 So.2d 1247 (Ala.), remanded for new sentencing hearing, 482 So.2d 1249 (Ala.Cr.App.1984). The result of Giles and Whisenhant is founded on the defendant's failure to prove bias on the part of the trial judge."
Rutledge v. State, 523 So.2d 1087, 1109 (Ala. Cr.App.1987), rev'd on other ground, 523 So.2d 1118 (Ala.1988).
Contrary to the appellant's assertion, we find no evidence that the trial judge in this case was personally biased toward the appellant. The appellant has failed to rebut the presumption that the trial judge was qualified and unbiased and, thus, we find no error in the court's denial of the appellant's motion.

VIII.
The appellant contends that he was denied his constitutional rights by the state's exercise of its peremptory jury strikes in a racially discriminatory manner, in violation of Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). He raised the Batson issue by motion to quash the venire after the jury was selected and before the jury was sworn.
Under Batson, the appellant was initially required to make a prima facie showing that the state had exercised a peremptory challenge or challenges on the basis of race. To prove a prima facie case of purposeful discrimination under Batson and its progeny, a defendant must show (1) that members of a cognizable racial group or gender were excluded from the defendant's jury; (2) that he or she is entitled to rely on the fact that peremptory challenges constitute a jury selection practice that permits "those to discriminate who are of a mind to discriminate," and (3) that these facts and other relevant circumstances raise an inference that the prosecutor used such a practice to exclude venirepersons from the jury on account of race or gender. See Project, Twenty-Fourth Annual Review of Criminal Procedure: United States Supreme Court and Courts of Appeals 1993-1994, 83 Geo.L.J. 665, 1125-26 (1995). If the defendant makes out a prima facie case of purposeful discrimination, the burden shifts to the state to go forward and articulate race- or gender-neutral explanations for the basis of the peremptory challenges.
In this case, the trial court found that the jury venire consisted of 76 potential jurors, of which 26 were black, and 50 were white. Thus, the black venirepersons constituted 34% of the venire. The court found that the state struck 18 blacks[5] and 14 whites and *96 that the appellant struck 29 whites and 3 blacks. At least one black was excused for cause on motion of the appellant. Four blacks remained on the trial jury. Thus, blacks comprised 33% of the trial jury. The state used 43.75% of its peremptory strikes to strike white venirepersons and 56.25% to strike black venirepersons. We find that the record supports the findings of the trial court.
The trial court was uncertain as to whether the appellant had made a prima facie case that the state had exercised its peremptory challenges on the basis of race, stating, "I think that 18-14 is possibly not a prima facie showing of improper jury selection." In fact, the trial court never made a finding that a prima facie showing had been made. However, it nevertheless "out of an abundance of caution" required the prosecutor to give his reasons for his peremptory strikes. Until the defendant has met his burden of establishing a prima facie case of purposeful discrimination in accordance with the requirements of Batson, the prosecution should not be required to state the reasons for its strikes. While we are not called upon to decide in this case whether the appellant established a prima facie case, we do not believe under the circumstances here that a prima facie case was established. However, when the trial court calls upon the prosecution for an explanation of its strikes without expressly finding a prima facie case, we proceed directly to evaluate the sufficiency of the ensuing explanations. Taylor v. State, 666 So.2d 36 (Ala.Cr.App.1994); Williams v. State, 548 So.2d 501 (Ala.Cr.App.1988), cert. denied, 489 U.S. 1028, 109 S.Ct. 1159, 103 L.Ed.2d 218 (1989).
The trial court evaluates an objection to the use of peremptory challenges under the three-step analysis set forth in Batson. First, as we have said, a defendant must make a prima facie showing that the state has exercised a peremptory challenge or challenges on the basis of race or gender. Second, once a prima facie showing has been made, the burden shifts to the state to articulate a race- or gender-neutral explanation for striking the prospective jurors in question that is related to the case to be tried. Batson, 476 U.S. at 98, 106 S.Ct. at 1724. The United States Supreme Court recently stated in Purkett v. Elem, 514 U.S. 765, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995), that the second step does not demand an explanation that is persuasive or even plausible. It stated that a legitimate explanation is not necessarily one that must make sense, but one that does not deny equal protection. At this step of the inquiry, the issue is facial validity of the prosecutor's explanation, and unless a discriminatory intent is inherent in the explanation, the reason offered will be deemed neutral. Id., at 767-68, 115 S.Ct. at 1771. When the defendant challenges as pretextual the prosecutor's explanations as to a particular venireperson, the inquiry becomes factual in nature and moves to step three. At this step the trial court must resolve the factual dispute, and whether the prosecutor intended to discriminate is a question of fact. Hernandez v. New York, 500 U.S. 352, 364-65, 111 S.Ct. 1859, 1868-69, 114 L.Ed.2d 395 (1991). In the third step, the trial court must determine whether the defendant has met his burden of proving purposeful discrimination. At this stage, the trial court must consider the persuasiveness of the explanations, and it is also at this stage that "implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination." Purkett, 514 U.S. at 768, 115 S.Ct. at 1771.
Upon the conclusion of the state's explanation for its peremptory strikes, the trial court overruled the appellant's motion, stating, "I'm convinced that this jury was selected in a non-discriminatory manner." At that time, the appellant offered nothing to rebut the state's reasons given for the strikes or to *97 show that the strikes were pretextual, but stated that he was at a disadvantage in evaluating the state's explanations because he did not have access to the state's files on the prospective jurors. The trial court accepted the explanations given by the state at that time, but ordered the prosecution to deliver its files on the prospective jurors to the appellant, which included information from the Alabama crime information computer and pretrial questionnaires that had been filled out by the prospective jurors. It stated that it would afford the appellant an opportunity at a later time to present evidence to rebut the state's explanations and that that action would relate back as if done before the jury was sworn.
Following the trial, the trial court conducted a hearing, at which the appellant was afforded an opportunity to present evidence to rebut the state's explanations. At this hearing, the appellant attempted to rebut the prosecutor's explanation of only one venireperson, E.H., number 84. The appellant introduced into evidence the questionnaires of all the venirepersons and argued that some white venirepersons whose answers were as equivocal or more equivocal on the death penalty issue than E.H.'s had not been struck, thus, he argued, constituting disparate treatment. After the hearing, the trial court entered a formal order, making findings of fact concerning the state's peremptory strikes and again overruling the appellant's motion to quash.
We will not reverse a trial court's Batson ruling unless it is clearly erroneous. Ex parte Lynn, 543 So.2d 709 (Ala.1988), cert. denied, 493 U.S. 945, 110 S.Ct. 351, 107 L.Ed.2d 338 (1989); Ex parte Branch, 526 So.2d 609 (Ala.1987); Mitchell v. State, 579 So.2d 45 (Ala.Cr.App.1991), cert. denied, 596 So.2d 954 (Ala.1992). The trial court is in a better position to rule on the prosecutor's reasons than this court, and great deference should be given to its findings. Hernandez v. New York, 500 U.S. at 364-66, 111 S.Ct. at 1869.
The trial court, in its order denying the Batson motion, made findings as to the reasons given by the state for its peremptory strikes. Its findings are as follows:
"Venireman Number 4White Female Struck due to answer on voir dire'iffy' as to whether capital punishment should be imposedprobably would vote for life without parole.
"Venireman Number 11White Male Questionable as to whether venireman would vote for the death penalty.
"Venireman Number 17Black Female Stated that she knew the Defendant and had an interest in the case and did not believe in capital punishment.
"Venireman Number 35Black Female She expressed reservation about the death penaltystated that she would rather opt for life without parolestated that capital punishment is never effective deterrent.
"Venireman Number 49White Female Stated that she would probably automatically go with life without parole.
"Venireman Number 52White Male Stated in his questionnaire that he was against capital punishmentthat capital punishment should be used only in extreme casesdid not think it was a deterrent.
"Venireman Number 57White Male Had extensive DUI convictions and a criminal mischief chargelicense had been revoked for DUI.
"Venireman Number 75ABlack FemaleDid not answer question on questionnaire with regard to capital punishmentshe said if necessary, and that was alldid not write any comment[s] on the next two questionscould not vote for the death penalty and equivocated with regard to capital punishment.
"Venireman Number 79Black MaleDid not believe in death penalty and could not vote for it.
"Venireman Number 87Black MaleOpposed to capital punishment, did not answer question on deathsaid he would choose life without parole every time if other option is death.
"Venire[person] Number 116Black FemalePrefers life without parole over the death penaltydid not think she could vote for death. (There is some question as to the race of this Venireman based on the *98 attached strike list and accompanying data sheets.)
"Venireman Number 117White FemaleHad convictions for bad checks and fraud.
"Venireman Number 130Black Female Didn't answer questions concerning the death penaltystated, `I do not believe in capital punishment; but I'm sure it isn't necessaryI'm not sure it isn't necessary. Capital punishment may be wrong; but it is the best prevention of crime.' She also stated, `Capital punishment is the most heinous practice of our time.' She was very equivocal on whether she was for or against the death penalty.
"Venireman Number 132White Male Preferred life without parole to the death penalty. Did not believe capital punishment was right.
"Venireman Number 136Black Male He answered the question about his opinion on capital punishment, `It may be a form of punishment that needs to be reviewed.' He also stated he did not think it would deter crime. `I don't believe in capital punishment; but I'm not sure it isn't necessary.' He stated capital punishment has never been effective in preventing crime. He was equivocal on whether he could vote for the death penalty.
"Venireman Number 140White FemaleHad a shoplifting conviction and a contributing to the delinquency of a minor conviction.
"Venireman Number 143Black Male72 years old, he couldn't fill out the questionnaire very well. He didn't fill out anything with respect to capital punishment at all. In fact, when the question began he didn't answer anything; and didn't sign the form. Could not understand his position on the death penalty.
"Venireman Number 144Black Male He had sat on a murder case and found the defendant innocent, and didn't answer his questions on the questionnaire. Did not answer questions after the questions beginning with the questions on capital punishment.
"Venireman Number 155Black Female She answered the question No. 42, `Capital punishment has not stopped crime so it only takes another person's life.' `Do you think it deters crime?' `No.' She checked `Capital punishment has never been effective in preventing crime.'
"Venireman Number 201ABlack FemaleShe referred to capital punishment as being a `Scapegoat.' Could not understand why she labeled it as a scapegoat. Her position on capital punishment was, therefore, questionable.
"Venireman Number 202 ... Black FemaleDid not return written questionnaire.
"Venireman Number 205Black MaleIn response to question #42 he stated that he did not believe in the death penalty, he did not believe it prevented crime, and could not vote for it.
"Venireman Number 209Black Male He had a criminal mischief third degree in 1980, a DUI, another DUI, another DUI, and refused to take a chemical test in 1990.
"Venireman Number 212Black Female She said that she could not vote for the death penalty, and she did not answer any of the questions with respect to capital punishment.
"Venireman Number 272White Male Attorney with Rushton, Stakely. Reluctant because of connection to law firm.
"Venireman Number 220White FemaleOpposed to the death penaltydid not believe in taking a life, possibly could do itwas equivocal on the death penaltyreligious beliefs would hinder.
"Venireman Number 222Black Female Stated that she was not for the death penaltydid not answer questions on the questionnaire with regard to the death penalty.
"Venireman Number 118White FemaleHad some question as to the death penaltystated in response to question as to her opinion about the death penalty, `I do not support'answered that the death penalty did not deter crime.
"Venireman Number 84Black Female Equivocal with regard to the death penaltystated in one place on the questionnaire that she was for capital punishment *99 but did not feel capital punishment to be a deterrentthen later in responding on the questionnaire she stated that capital punishment was a definite deterrentwould state one thing then turn around and state something elseDistrict Attorney stated that he could not determine how she really felt about capital punishmentthat she was struck due to questions on the questionnaire and demeanor.
"Venireman Number 108White Male Had reservations about capital punishmentcould weigh death as opposed to life without parole, and tended toward life without parolementioned about the rehabilitating nature of defendants.
"Venireman Number 82White Female Stated during colloquy with the Court that she was prone to vote for life without parolethat maybe under premeditated circumstances she could go for capital punishment, but very reluctantcapital punishment to be used only as a last resort equivocal as to whether she could vote for capital punishmentdid not check other questions."
The appellant contends that the prosecutor used each of his peremptory strikes against black venirepersons in violation of Batson. On appeal, he specifically contests the explanations offered by the prosecutor, and accepted by the trial court, for striking venirepersons L.M. (130), T.M. (136), L.M. (143), E.H. (84), W.T. (209), M.W. (75A), E.V. (212), P.C. (35), G.R. (188A),[6] and K.T. (201A). He also points out the prosecutor's failure to give any reason for his striking D.T. (202). The only specific objection raised in the trial court to the prosecutor's explanation for striking a venireperson was to the explanation given concerning E.H. Had the appellant perceived anything suggesting a discriminatory motive in the prosecutor's strikes concerning the other venirepersons, he should have articulated his concerns to the trial court during its factual inquiry at the third step of the Batson hearing.
With the exception of D.T., the prosecutor articulated facially race-neutral reasons, which were reasonably specific and trial-related, for striking the other named venirepersons. The explanations were neither "implausible or fantastic." As noted, the appellant challenged only the reason given for E.H.; he did not challenge the reasons given for the other named venirepersons. Thus, he failed to meet his burden of proving purposeful discrimination in regard to those venirepersons.
Specifically as to E.H., the appellant contends that the reasons given by the prosecutor for striking her were inadequate and pretextual. As we have previously stated, the trial court found that the reasons given for striking her were (1) that her responses on her questionnaire pertaining to the imposition of the death penalty were equivocal and (2) her demeanor. The record showing the reasons given by the prosecutor for striking this venireperson is as follows:
"MR. GRADDICK [prosecutor]: This is the Mental Health lady, worked for Mental Health. Her husband is deceased. She equivocated in front of your Honor, as I recall, when she was answering questions. She states down here that she is for capital punishment but doesn't feel that it is a deterrent. But then again she turns around and says that she thinks it's a definite deterrent when she starts to checking things. I had a difficult time, quite honestly, her being a Mental Health worker. Over my 17 years I have found that Mental Health folks want to rehabilitate.
"THE COURT: Well, the Supreme Court says you can't have just general things like that.
"MR. GRADDICK: I know. I didn't feel comfortable with her position with regard to capital punishment.

*100 "THE COURT: She filled out the questionnaire?
"MR. GRADDICK: Yes, sir. She would state one thing and then turn around and state something else. I just couldn't figure out how she really felt about capital punishment. She was one of the latter persons to be struck.
"THE COURT: Is she black or white?
"MR. BELSER [prosecutor]: Black female.
"THE COURT: The reason you struck her was the questions on the questionnaire and her demeanor?
"MR. GRADDICK: Yes, sir. If you read it, it's just not consistent with how she feels about the death penalty. And her demeanor didn't give us any clue either.
"THE COURT: Do you think capital punishment deters or prevents crime? No. She's for it in the answer. She says for it; but it doesn't deter crime. She would be able to recommend. Then down here she says capital punishment is a very definite deterrent.
"MR. GRADDICK: Right. I couldn't tell whether she was for it or against it. With regard to her total outlook about it, I was just not comfortable with her.
"THE COURT: All right...."
Her answers on her questionnaire show that she was not opposed to capital punishment. She further indicated that she thought that capital punishment is a deterrent. Yet to another question she stated that she did not think that capital punishment was a deterrent to crime. The appellant argues that some white venirepersons were not struck even though their answers to their questionnaires were as equivocal or contradictory as the answers of E.H. He contends that this constituted disparate treatment, which, he argues, supports his contention that the reason given for the striking of E.H. was pretextual. We find no evidence here of disparate treatment between white venirepersons and black venirepersons. We find it reasonable for the prosecutor to have cautiously concluded that E.H.'s equivocation on whether capital punishment truly deters crime was a real indication that she would not staunchly assert the death penalty. The prosecutor also struck white venirepersons who were opposed to or appeared reluctant to impose the death penalty. "Where whites and blacks are struck for the same reason, there is no evidence of disparate treatment." Carrington v. State, 608 So.2d 447, 449 (Ala.Cr.App.1992). Based on the reasons given by the prosecutor for his strikes, our review of the questionnaires of all the venirepersons, the voir dire, and the deference to be paid to the trial court's findings of fact on this matter, we conclude that the prosecutor's peremptory challenge of E.H. was not discriminatory.
The appellant further contends that the trial court erred in denying his Batson motion because of the prosecutor's failure to give any explanation for his strike of venireperson D.T., number 202. He argues that the failure to provide a reason for striking D.T. resulted in the state's failing to meet "its burden to rebut the presumption" that the challenge of D.T. was based on race. He relies on Ex parte Williams, 571 So.2d 987 (Ala.1990). The record shows that the prosecutor did, indeed, fail to explain his strike of D.T. It appears that his failure to do so was inadvertent and not intentional as suggested by the appellant. While giving his reasons for his strikes, the prosecutor was unable to locate D.T.'s questionnaire when he came to her name, and he stated to the court that he "would come back to her." After giving the remainder of his reasons, he failed to go back and explain his strike of D.T. In its order denying the Batson motion, the trial court incorrectly found that D.T. had been struck by the state for failing to return her questionnaire. D.T. had, in fact, completed and returned her questionnaire, and it is included in the record on appeal. We find that the trial court was simply mistaken in its finding as to D.T. However, the incorrect finding of the trial court has no bearing on our decision on this issue. Here, we are not concerned with the sufficiency of a reason for the strike; we are concerned with a situation where no reason at all was given.
The appellant never specifically objected in the trial court to the prosecutor's failure to explain his strike of D.T. When he was *101 given the opportunity to rebut the prosecutor's reasons for his strikes, he never mentioned that the prosecutor had failed to explain the strike of D.T. This issue is now raised for the first time on appeal.
In Bui v. State, 627 So.2d 855 (Ala.1992), the Alabama Supreme Court held that a reviewing court must look at all of the existing circumstances to determine whether a trial court's conclusion that the prosecutor's reasons for its jury strikes are race-neutral is clearly erroneous. The court further held in Bui that under all of the circumstances of that case, the failure of the prosecutor to offer an explanation for one of its peremptory strikes did not mandate a finding that a Batson violation had occurred. The court stated:
"Recently, in Huntley v. State, 627 So.2d 1013 (Ala.1992), this Court held that in reviewing allegations that the prosecutor exercised the state's peremptory strikes in a racially discriminatory manner, `the reviewing court's inquiry ... shall not be restricted by the mutable and often overlapping boundaries inherent within a Batson-analysis framework, but, rather, shall focus solely upon the "propriety of the ultimate finding of discrimination vel non."` 627 So.2d at 1015, quoting United States v. Forbes, 816 F.2d 1006, 1010 (5th Cir.1987), in turn quoting Merrill v. Southern Methodist University, 806 F.2d 600, 605 n. 6 (5th Cir.1986). In United States v. Forbes, the Fifth Circuit Court of Appeals, upholding the defendants' convictions, noted:
"`The Eleventh Circuit has observed, correctly we think, "Failure by a prosecutor to explain every peremptory strike of black jurors is not necessarily fatal to the prosecutor's ability to rebut a prima facie case; likewise, explanation of most of the strikes on nonracial grounds does not necessarily" satisfy his burden. United States v. David, 803 F.2d 1567, 1571 (11th Cir.1986).
"`In this case, the prosecutor's third strike, though unexplained, seems unlikely to have been the result of intentional discrimination. The confluence of the following facts leads to this conclusion: (1) the black/white ratio on the jury mirrored that of the venire; (2) the prosecutor adequately explained two strikes; (3) the prosecutor did not use all his strikes; (4) there were two blacks left on the jury. Although the existence of fewer than all or most of these circumstances might be insufficient to prevent or rebut an inference of intentional discrimination, see Fleming v. Kemp, 794 F.2d 1478, 1483 (11th Cir.1986) ("Nothing in Batson compels the district court's conclusion that constitutional guarantees are never abridged if all black jurors but one or two are struck because of their race."), the Court is mindful of Justice Holmes's comment in a different context that "we cannot let the fagot be destroyed by taking up each item ... separately and breaking the stick." Edwards v. Chile Copper Co., 270 U.S. 452, 454-56, 46 S.Ct. 345, 346, 70 L.Ed. 678 (1926). There is significance, perhaps determinative significance, in the coexistence of these facts.'
"816 F.2d at 1011 n. 7.
"In Ex parte Demunn, 627 So.2d 1010 (Ala.1992) (released the same day as Huntley v. State), we applied the rationale of United States v. Forbes and United States v. David in affirming Demunn's conviction. In Demunn, the prosecutor gave race-neutral reasons for striking two black persons from the venire, but he could not recall why he had stricken the third. Even so, after carefully considering all of the circumstances surrounding the selection of the jury, we concluded that the record supported the inference that the prosecutor had not exercised any of the state's peremptory strikes in a racially discriminatory manner, and we affirmed the judgment of the Court of Appeals, on the authority of Huntley."
Ex parte Bui, 627 So.2d at 859-60.
Applying the rationale of Bui to the instant case, we conclude that the prosecutor's strike of D.T., although unexplained, was not the result of intentional racial discrimination. We considered the following facts in reaching this conclusion: The black-white ratio on the jury mirrored that of the venire ("In a proper *102 case, the fact that the percentage of blacks on the jury is higher than the percentage of blacks on the venire may be a factor to be considered in deciding whether a prima facie case of discrimination has been made or rebutted.") Ex parte Thomas, 659 So.2d 3, 8 (Ala.1994); race-neutral reasons were given by the prosecutor for striking 17 of the 18 black persons removed from the venire; the prosecutor had the opportunity to strike all of the blacks on the venire but did not do so; the appellant was instrumental in removing one black venireperson for cause; there were 4 blacks left on the trial jury; extensive voir dire of the venire was conducted; the state was required to turn over to the appellant its files concerning the venire, which included questionnaires submitted by the venirepersons; and the trial court gave the appellant an opportunity, after he had reviewed the state's files, to rebut the reasons given for the strikes by the prosecutor. After reviewing all the circumstances of this case, we cannot hold that the trial court's finding of an absence of racial discrimination with respect to the prosecutor's strike of D.T. was clearly erroneous. Based on the reasons given by the prosecutor for his strikes, the sparse information offered by the appellant in rebuttal to those strikes, the other existing circumstances noted above, and the deference to be accorded the trial court's findings, we conclude that the appellant failed to carry his burden of proving purposeful discrimination as to all of the prosecutor's peremptory strikes. We cannot say that the ruling of the trial court that the prosecutor's peremptory strikes were race-neutral was clearly erroneous. Thus, we find that its denial of the Batson motion was proper.

IX.
The appellant contends that two counts of the capital murder indictment are defective because they do not specify the property he is alleged to have stolen or was attempting to steal, and that this deprived him of adequate notice of what he would be called upon to defend against. He does not identify the counts to which he is referring. Counts I and II describe the alleged property that was the subject of the theft or attempted theft as "two bags of Zodiac sign tags, a better description of which is unknown... [and] the value of which is unknown...." Counts III and IV do not specifically identify the property; they state that the theft was of "property, to-wit: the kind, amount or value otherwise unknown... a better description of the property is otherwise unknown."
The appellant did not challenge the sufficiency of the indictment at trial; he raises this issue for the first time on appeal. Thus, we must examine this issue under the plain error rule. We note that this issue was never raised at the previous two trials and appeals.
"The indictment ... shall be a plain, concise statement of the charge in ordinary language sufficiently definite to inform a defendant of common understanding of the offense charged and with that degree of certainty which will enable the court, upon conviction, to pronounce the proper judgment." Rule 13.2(a), Ala.R.Cr.P. Counts I and II aver the specific property alleged to have been stolen and meet the requirements of the rule. However, Counts III and IV would have been subject to motions to dismiss because they did not inform the appellant of the specific property alleged to have been stolen. Counts III and IV charged the appellant expressly in the terms of the appropriate statutes: §§ 13A-5-40; 13A-6-2; 13A-8-41, and 13A-8-43. If an indictment charges a crime substantially in the terms of the statute creating the offense and sets out all the material elements thereof, it will generally support a conviction even though it might be subject to a proper motion to dismiss. In such a case, the indictment is not void but merely voidable. Ex parte Horton, 456 So.2d 1120 (Ala.1984). A defect in an indictment that renders it merely voidable is waived by the failure to raise the issue in a timely manner. Ex parte Horton; Odom v. State, 625 So.2d 1171 (Ala.Cr.App.1993). In the instant case, the failure of Counts III and IV to specify the property taken rendered the counts merely voidable, and the appellant waived this irregularity by failing to raise it in a timely fashion. This is not an instance where the indictment was so defective that it failed to inform the appellant of the nature *103 and cause of the charge against him. See Ex parte Tomlin, 443 So.2d 59 (Ala.1983), cert. denied, 466 U.S. 954, 104 S.Ct. 2160, 80 L.Ed.2d 545 (1984) (by entering a plea at arraignment, a defendant waives any irregularities in the indictment unless the indictment is so defective that it leaves the accused unaware of the nature and cause of the charge against him).
For the above reasons, we find no merit in this contention.

X.
The appellant contends that the denial of his request for the state to provide him reasonable funds to employ certain experts deprived him of his constitutional rights to effective assistance of counsel, due process of law, and "reliability in the capital guilt determination and sentencing process." U.S.C.A. Const. Amends. 5, 6, 8, and 14.
The appellant is indigent and was represented at trial by appointed counsel. Before this trial, he filed a motion seeking approval of funds to employ a criminal investigator, a psychologist/social worker, a ballistics expert, a forensic psychologist, and a jury selection expert. He alleged that he wanted a criminal investigator "to investigate the facts and witnesses surrounding the alleged crime"; a psychologist/social worker to develop a social history of the appellant to be used at the sentencing phase of the trial for mitigation purposes, should he be found guilty; a ballistics expert to "help his attorneys attack the findings of the state's expert"; and a jury selection expert to aid counsel in "intelligently" exercising jury challenges. He moved the trial court to hear his motion ex parte, i.e., before the trial court only and without the presence of the prosecution. He subsequently filed a sealed supplement to his motion for funds to secure experts, giving the names of the experts he expected to employ and the estimates of their fees and expenses. He stated in this supplementary motion that he had not located a ballistics expert. A hearing was held on the motion, as supplemented, on August 18, 1988, and the trial court entered an order on September 10, 1988, denying the request for funds to employ a criminal investigator, a psychologist/social worker, and a jury selection expert. The trial court approved funds of $4,000 for employing a forensic psychologist and, although denying funds for a ballistics expert, stated that it would reconsider the request if and when a ballistics expert could be found. The appellant was given an opportunity to file with the court additional information ex parte in written form in support of his motion, but failed to do so.
Section 15-12-21(d) provides that the state will reimburse reasonable expenses incurred in defending an indigent defendant on approval in advance by the trial court. In Dubose v. State, 662 So.2d 1189 (Ala.1995), the Alabama Supreme Court stated the rule as follows:

"Ake [v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985)] and Caldwell [v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985) ], taken together, hold that a defendant to be entitled to funds to pay for an expert, must show more than a mere possibility of assistance from an expert. Rather, the defendant must show a reasonable probability that an expert would aid in his defense and that the denial of an expert to assist at trial would result in a fundamentally unfair trial.
"....
"... [W]e conclude that the principles enunciated in Ake, and grounded in the due process guarantee of fundamental fairness, apply in a case of nonpsychiatric expert assistance when an indigent defendant makes a proper showing that the requested assistance is needed for him to have `a fair opportunity to present his defense.'
Dubose, supra, at 1192-94 (quoting Ake, 470 U.S. at 76, 105 S.Ct. at 1092).
Although the trial court stated that it would reconsider its order denying the funds for a ballistics expert if the appellant found such an expert, the appellant failed to pursue his request with specific information requested by the court. Moreover, we point out the following qualifications:
"The only time a defendant, whether indigent or not, has the right to have an *104 independent expert examine physical evidence is when such evidence is (1) `critical' and (2) subject to varying expert opinions. Barnard v. Henderson, 514 F.2d 744 (5th Cir.1975). To be `critical,' the evidence must be the only evidence linking the accused with the crime or proving an element of the corpus delicti. Hoback v. Alabama, 607 F.2d 680 (5th Cir.1979). Even if the evidence is indeed `critical,' it is not subject to independent examination unless it is also subject to varying expert opinion. White v. Maggio, 556 F.2d 1352, 1358 (5th Cir.1977). This is the law of this state. Gwin v. State, 425 So.2d 500, 508 (Ala. Crim.App.1982), cert. quashed, 425 So.2d 510 (Ala.1983)."
Grayson v. State, 479 So.2d 69, 75 (Ala.Cr. App.1984), affirmed, 479 So.2d 76 (Ala.), cert. denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985). Here, the appellant confessed that he shot all three victims and led the officers to a pistol which, he told them, was the pistol that he used to shoot the three. The ballistics test showed that the bullets that killed Dominguez and Adams and wounded Holmes were fired from that pistol. Under these circumstances, the ballistics evidence was neither critical nor subject to varying expert opinion.
In regard to the trial court's denial of funds for an investigator to investigate the "facts and witnesses surrounding the alleged crime," there was certainly no reason to approve them. The case had been tried and appealed twice; the witnesses were well known to the defense; and the facts were not only known, but virtually undisputed.
After reviewing the record, we also conclude that the appellant failed to make a sufficient showing that there was a reasonable probability that a psychologist/social worker and a jury selection expert would aid in his defense and that the denial of such experts to assist him would result in a fundamentally unfair trial. His showing in regard to these experts, as with his showing in regard to a criminal investigator and a ballistic expert, was no more than "undeveloped assertions that the requested assistance would be beneficial." Caldwell v. Mississippi, 472 U.S. at 324 n. 1, 105 S.Ct. at 2637 n. 1.
We find that the trial court did not commit error in denying the appellant's motion in part for funds to employ experts.
The appellant further contends that the trial court erred in refusing his request for an ex parte hearing on his motion for funds to employ experts. He argues that had he proceeded in the prosecutor's presence to make a showing of necessity to employ experts, he would have been forced to reveal his theory of defense to the state, which would have deprived him of his privilege against self-incrimination, his right to counsel, and his right to present a defense, in violation of his Due Process and Equal Protection rights. He contends that because of the trial court's refusal to hold an ex parte hearing, he was "prevented from providing the trial court with additional evidence and information, available to him, in support of his requests." He relies principally on Ake v. Oklahoma, 470 U.S. 68, 82-83, 105 S.Ct. 1087, 1097, 84 L.Ed.2d 53 (1985), particularly the Court's reference that "when the defendant is able to make an ex parte threshold showing to the trial court that his sanity is likely to be a significant factor in his defense, the need for the assistance of a psychiatrist is readily apparent." He argues that this language mandates an ex parte hearing.
We do not agree with the appellant that the trial court refused to permit an ex parte hearing. The record shows that the trial court permitted the appellant to file with the court a supplementary motion under seal and afforded him the opportunity to file any additional information he desired in writing ex parte in support of his motion. The record shows, in pertinent part, the following:
"MR. BALSKE [defense counsel]: Has the Court denied the defendant's right to make an ex parte showing, to make this showing?
"THE COURT: No. I said that I will read this [supplementary motion]; and I'll read anything else you want me to look at.
"MR. BALSKE: I think what the defendant is requesting is to put on testimony to the Court.
"THE COURT: I had heard what you said; and I said I would look at anything *105 you give me. If it's ex parte I might as well read it rather than listen to you saying it. I've read it [supplementary motion] rather than listen to you saying it. Do you understand what I'm saying.
"MR. BALSKE: I understand, Judge.
"THE COURT: I've read your [supplementary motion]; and if you want to give me something else I'll read it. If you are going to have ex parte there won't be anybody to cross-examine. If you haven't got any more to say than what you have on Number 3 [supplementary motion re: a ballistics expert], I overrule you; and I will look at whatever else you have got and reconsider if and when you file something."
We find that this procedure in effect constituted an ex parte hearing. When the trial court afforded him the opportunity to file additional information in writing, he raised no objection to this procedure. Moreover, he had ample opportunity, in fact two years, to file additional information before trial, but did not do so.
Because we find that the trial court did, in essence, afford the appellant an ex parte hearing, we find it unnecessary to address the question whether an indigent criminal defendant's application for funds for expert assistance should be heard outside the presence of counsel for the state. Our appellate courts have not previously addressed this question by published opinion. However, we have granted a writ of mandamus ordering a trial court to provide an ex parte hearing under circumstances similar to those in this case. Ex parte Grimsley, 602 So.2d 1226 (Ala.Cr.App.1992) (table). We note that other jurisdictions that have addressed this question have required ex parte hearings. See, e.g., Brooks v. State, 259 Ga. 562, 385 S.E.2d 81 (1989), cert. denied, 494 U.S. 1018, 110 S.Ct. 1323, 108 L.Ed.2d 498 (1990); People v. Loyer, 169 Mich.App. 105, 425 N.W.2d 714 (1988); Banks v. State, 810 P.2d 1286 (Okla.Cr.App.1991), cert. denied, 502 U.S. 1036, 112 S.Ct. 883, 116 L.Ed.2d 787 (1992).
The appellant further contends that Alabama's system for compensating attorneys appointed to represent indigent defendants set out in § 15-12-21 is unconstitutional in that it violates the Due Process and Equal Protection Clauses of the Fourteenth Amendment, the Sixth Amendment right to counsel, the Fifth Amendment prohibition against unlawful taking of property, the Eighth Amendment prohibition against cruel and unusual punishment, and the parallel provisions of the Alabama Constitution.[7] We find no merit in this contention. The Alabama Supreme Court in Ex parte Grayson, 479 So.2d 76 (Ala.), cert. denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985), held that our system for compensating appointed attorneys does not violate principles of due process or equal protection. It also held in Sparks v. Parker, 368 So.2d 528 (Ala.1979), appeal dismissed, 444 U.S. 803, 100 S.Ct. 22, 62 L.Ed.2d 16 (1979), that § 15-12-21 does not constitute an unlawful taking of property in violation of the Fifth Amendment. We also find no violation of the right to counsel and of the protection against cruel and unusual punishment. We find no violation here of either the federal or state constitution. The record reflects that the appellant has been ably represented at trial and on appeal by experienced counsel. It does not indicate in any way that counsel's efforts were deterred or diminished by the fees and expenses allowed by the statute. In fact, the appellant's counsel illustrates the thoroughness with which he prepared for and represented the appellant by the following statement in his brief:
"Because [the appellant] was being tried for the third time for a 1981 offense, defense counsel was obligated to review 10 years' worth of proceedings including the transcripts of two previous trials, and to locate many documents that had long since been lost or misplaced, and interview numerous witnesses who had moved or disappeared."

XI.
The appellant contends that the trial court erred in denying his motion for *106 leave to participate as co-counsel at his trial. Relying on Faretta v. California, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), he argues that the trial court's refusal to allow him to act as co-counsel abridged his constitutional right to serve as his own counsel. Faretta v. California recognizes that an accused has a Sixth Amendment right to conduct his own defense in a criminal trial. Although a defendant has a Sixth Amendment right to be represented by counsel or to represent himself, he does not have the constitutional right to hybrid representation. Holland v. State, 615 So.2d 1313 (Ala.Cr.App.1993); Christianson v. State, 601 So.2d 512 (Ala.Cr.App.1992), overruled on other grounds, Ex parte Thomas, 659 So.2d 3 (Ala.1994). The decision to permit a defendant to serve as co-counsel rests in the sound discretion of the trial court. United States v. Mills, 704 F.2d 1553 (11th Cir.1983); Hunt v. State, 659 So.2d 933 (Ala.Cr.App.1994), aff'd, 659 So.2d 960 (Ala.), cert. denied, ___ U.S. ___, 116 S.Ct. 215, 133 L.Ed.2d 146 (1995).
Contrary to the appellant's contention, the record reveals that the trial court did not refuse to allow the appellant to act as co-counsel, but granted his motion. The record shows the following:
"THE COURT: One other thing. I notice on Motion to Allow Accused to Participate as Trial Counsel, I didn't write on that. We discussed that he would not be permitted to make any statement during the guilt phase. I think I granted it otherwise.
"MR. GLASSROTH [defense counsel]: I believe that's what you did.
"THE COURT: Granted except as to statement of defendant not under oath.
"MR. GLASSROTH: Naturally, Your Honor, we object.
"THE COURT: Wait a minute. I'm not through ruling yet. Or subject to cross examination. Any statement you want him to make to the jury, I'll consider it. He's entitled to participate as counsel any way he wants to other than making a statement that wouldn't be under oath, and making a statement that wouldn't be subject to cross-examination. However, if you want to give me in writing a statement that he proposes to make, I'll review that and get the State's response to it and make additional rulings at that time.
"MR. GLASSROTH: Okay, Your Honor, I understand. And for purposes of the record, the defendant objects to anything which would inhibit the accused's ability to participate in any way as counsel for himself in this cause.
"THE COURT: He can participate in any way, except I want it shown to me first any statement he wants to make. I'll not rule on that; but I'll rule on it when you show me what it may or may not be.
"....
"THE COURT: I'll do this too, on any statement he wants to make, if he wants to tell me anything either orally or in writing prior to making it to the jury, I'll rule on that at that time. Do y'all understand what I'm saying?
"MR. GLASSROTH: Yes, sir.
"THE COURT: He can't just get up and make a closing or make any kind of statement to the jury if he's not under oath, unless he either tells me or y'all tell me on his behalf, or he gives it to me in writing, what his statement will be, and then we will go into that then.
"....
"THE COURT: Now, the State puts on testimony, the defense will put on testimony. I will revisit what I said about the defendant participating as counsel at this time. I said he could participate as counsel except that I want anything he is going to say to be written out. I will hear what you all have to say about that at this time. "MR. GLASSROTH: Could we have about two minutes to talk about it? ... The defendant does not want to make a statement."
In granting the appellant leave to act as cocounsel, with the restriction that he would not be permitted to make a statement before the jury that was not under oath or subject to cross-examination without the court's prior approval, the trial court was obviously forbidding a testimonial statement not under oath or subject to cross-examination. In so ruling, the court was not refusing to allow the appellant to act as co-counsel, and furthermore, *107 the record shows no instance in which he was not permitted to act as co-counsel.
The right of self-representation does not excuse a defendant from complying with the relevant rules of procedure and substantive law. Faretta v. California; Justus v. Commonwealth, 222 Va. 667, 283 S.E.2d. 905 (1981), cert. denied, 455 U.S. 983, 102 S.Ct. 1491, 71 L.Ed.2d 693 (1982). The "rules of evidence, procedure, and substantive law will be applied the same to all parties in a criminal trial whether that party is represented by counsel or acting pro se." Williams v. State, 549 S.W.2d 183, 187 (Tex. Cr.App.1977). The appellant's motion for self-representation could well have been a ploy for the appellant to "testify" before the jury without the safeguard of an oath or the risk of cross-examination or impeachment. An accused need not be permitted to make a statement that which is really testimonial in nature without taking the witness stand. Justus v. Commonwealth; 22 C.J.S. Criminal Law § 296. In the instant case, we find no merit in the appellant's contention, and no error in the procedure followed by the trial court.

XII.
The appellant contends that the trial court erred in failing to grant challenges for cause as to several members of the jury venire. In reviewing these challenges, we are guided by the following principles:
"The grounds on which a juror may be challenged for cause are set out in Code 1975, § 12-16-150. Additional grounds for challenge for cause under the common law still exist where they are not inconsistent with the statute. Kinder v. State, 515 So.2d 55, 60 (Ala.Crim.App.1986).
"In challenging a juror for cause, the test to be applied is that of probable prejudice. Alabama Power Co. v. Henderson, 342 So.2d 323, 327 (Ala.1976). While probable prejudice for any reason will serve to disqualify a prospective juror, qualification of a juror is a matter within the discretion of the trial court. Id.; Black Belt Wood Co. v. Sessions, 514 So.2d 1249, 1255-56 (Ala.1986); Village Toyota Co. v. Stewart, 433 So.2d 1150, 1156 (Ala.1983). This Court must look to the questions propounded to, and the answers given by, the prospective juror to see if this discretion was properly exercised. Id. A reversal is not appropriate absent abuse of this discretion. Alabama Power Co. v. Henderson, 342 So.2d at 327; Grandquest v. Williams, 273 Ala. 140, 135 So.2d 391 (1961); Mutual Building & Loan Ass'n v. Watson, 226 Ala. 526, 147 So. 817 (1933); Brown v. Woolverton, 219 Ala. 112, 115, 121 So. 404 (1928); see Clark v. State, 443 So.2d 1287 (Ala.Crim.App.1983)."
Knop v. McCain, 561 So.2d 229, 232 (Ala.1989).
First, the appellant contends that venireperson W.B. should have been disqualified because he knew several facts regarding the charged offense and knew that the appellant had been previously tried and convicted of the capital murder of Dominguez.
"`Prospective jurors who have heard of a defendant's previous conviction on the same charges need not be automatically excluded from the venire.' Whisenhant v. State, 482 So.2d 1225 (Ala.Crim.App.1982), affirmed in part, remanded with directions on other grounds, 482 So.2d 1241 (Ala. 1983); affirmed on remand, 482 So.2d 1246 (Ala.Crim.App.1983); Giles v. State, [Ms. 6 Div. 86, January 10, 1984], [554] So.2d [1073] (Ala.Crim.App.1984). A prospective juror with knowledge of a previous conviction need not be dismissed for cause, if the trial court determines that the juror does not have a fixed opinion of appellant's guilt, but rather can lay aside any preconceived notions or opinions and render a verdict based solely upon the evidence presented in court. Murphy v. Florida, 421 U.S. 794 ... [95 S.Ct. 2031, 44 L.Ed.2d 589] (1975); Whisenhant v. State, supra; Giles v. State, supra. This determination is a matter left to the sound discretion of the trial court. See, Robinson v. State, 430 So.2d 883 (Ala.Crim.App.1983), and cases therein cited."
Beck v. State, 485 So.2d 1203, 1205 (Ala.Cr. App.1984), aff'd, 485 So.2d 1207 (Ala.1985). (Emphasis original.)
*108 The record, in pertinent part, shows the following:
"THE COURT: Did anything that you heard, or anything that you know about this case, does any of that cause you to have an opinion as to whether or not this man here, Mr. Bush, is guilty or whether he's innocent of this offense?
"W.B.: Not really.
"THE COURT: If you were selected on the jury, how would you go about determining whether or not he's guilty?
"W.B.: By the evidence presented in court.
"....
"MR. GLASSROTH [defense counsel]: You remember an awful lot back 10 years. Knowing that one jury of 12 has sat there and gone through the painstaking process, and knowing they returned a verdict of guilty, would have some influence on you, wouldn't it?
"W.B.: I don't think so.
"MR. GLASSROTH: You think you could look at this completely detached from what may have happened before?
"W.B.: As much as humanly possibly.
"....
"MR. GLASSROTH: .... Knowing about the prior proceeding and knowing all the stuff that you obviously have held onto for the period of time you have, can you say for sure that you can look at this and not put all of that out of your mind; or do you feel that it might affect you?
"W.B.: I can say I am capable of considering the evidence presented in court.
"....
"THE COURT: .... The law says that the State must prove to you beyond a reasonable doubt that he did it.... Now could you apply that legal standard to the facts?
"W.B.: I think so; pretty sure.
"THE COURT: And the fact, as Mr. Glassroth says, and what you know about a prior proceeding, would that interfere with your being able to (1) objectively determine what happened in your own mind; and once you determine sure enough what happened, and applying the facts to that, can you do that in a fair, just and evenhanded way?
"W.B.: Yes.
"....
"MR. GLASSROTH: Well, let's say if the evidence was close, it was a close call for you, and you knew from the back of your mind that there was a prior conviction on the same case, don't you think that would tilt you toward convicting?
"W.B.: I don't think so...."
The record obviously shows that despite W.B.'s knowledge of some of the facts surrounding the charged crime and of the fact the appellant had previously been convicted of it, he could set that aside and decide the case based solely on the evidence presented in court. It is clear that he had no fixed opinion and was capable of giving the appellant a fair trial. We find that the trial court did not abuse its discretion in refusing to grant the appellant's challenge for cause of W.B.
Second, the appellant appears to contend in footnote 74 to his brief to this case that venireperson V.J. should have been removed for cause sua sponte by the trial court. He contends that because she "handled the record of the victim in this case" through her work with the Montgomery Fire Department, she should have been removed from the venire. As the state points out in its brief, venireperson V.J. was not challenged by the appellant; therefore, we must review the appellant's contention under the plain error rule. There was no individual voir dire of V.J. In our opinion, the fact that she "handled" or was involved in the administrative processing of some kind of record concerning the victim as part of her duties at the fire department was not a sufficient reason to require the trial court to remove her sua sponte. Moreover, the appellant was not prejudiced by the court's failure to remove V.J. from the venire because she was peremptorily struck by the state. We find no plain error here.
The appellant also contends in the same footnote that venireperson J.S. should have been removed because of his exposure to pretrial publicity. J.S., who lived near *109 and frequented the Majik Market, stated that he remembered the charged crime and some of the details; that he read about it in the newspapers and listened to news broadcasts regarding it; and that, at the time, he had formed "some opinion" about it. However, when questioned regarding his ability to listen to the trial court's instructions and to apply those instructions to the facts in a fair and impartial manner, he stated that he would do so to the best of his ability. He stated that he had since forgotten what he had read and heard and that he did not know the appellant. In addition, in response to the trial court's question regarding whether the publicity would influence him, he answered, "No." After considering J.S.'s answers to the questions propounded to him on voir dire in their entirety, we find that the trial court did not abuse its discretion in refusing to grant the appellant's challenge of him for cause. We believe that the record supports our conclusion that J.S. did not have a fixed opinion of the appellant's guilt and could have laid aside any preconceived opinion and have rendered a verdict based solely on the evidence presented in court.
The appellant contends that the following venirepersons should have been removed for cause because, he says, they indicated that they would automatically vote for a death sentence: M.E., M.A., W.C., M.D., B.H., B.R., L.S., C.T., R.H., S.S., and G.S. We note that of these venirepersons, the appellant challenged only W.C., B.R., L.S., C.T., R.H., and S.S.
"The proper standard for determining whether a prospective juror may be excluded for cause because of his or her views on capital punishment is `whether the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath."` Wainwright v. Witt, 469 U.S. 412 [424], 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985); Gray v. Mississippi, 481 U.S. 648 [657-58], 107 S.Ct. 2045, 2051, 95 L.Ed.2d 622 (1987). `The crucial inquiry is whether the venireman could follow the court's instructions and obey his oath, notwithstanding his views on capital punishment.' Dutton v. Brown, 812 F.2d 593, 595 (10th Cir.), cert. denied, Dutton v. Maynard, 484 U.S. 836, 108 S.Ct. 116, 98 L.Ed.2d 74 (1987). A juror's bias need not be proved with `unmistakable clarity' because `juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism.' Id."

Martin v. State, 548 So.2d 488, 490 (Ala.Cr. App.1988), aff'd, 548 So.2d 496 (Ala.), cert. denied, 493 U.S. 970, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989).
We have reviewed the testimony on voir dire of all the venirepersons named above and find that each of them stated that he or she would follow the court's instructions in determining whether to recommend a sentence of death or of life imprisonment without parole, in the event the appellant was found guilty. We find no error in the trial court's denial of the appellant's challenges for cause and no plain error in the unchallenged venirepersons remaining on the venire. Finally, because the jury that tried the case recommended a sentence of life without parole, we find that the appellant suffered no prejudice in the named venirepersons remaining on the venire.
"`The holding in Witherspoon [v. Illinois], 391 U.S. 510, [88 S.Ct. 1770, 20 L.Ed.2d 776 (1968)], is not applicable where the jury recommends a sentence less than the death sentence. Bumper v. State of North Carolina, 391 U.S. 543, [88 S.Ct. 1788, 20 L.Ed.2d 797 (1968) ].' Eady v. State, 284 Ala. 327, 328, 224 So.2d 876, 877 (1969) (quoted in Neelley v. State, 494 So.2d 669, 680 (Ala.Cr.App.1985), aff'd, 494 So.2d 697 (Ala.1986), cert. denied, 480 U.S. 926, 107 S.Ct. 1389, 94 L.Ed.2d 702 (1987))."
Murry v. State, 562 So.2d 1348, 1358 (Ala.Cr. App.1988).

XIII.
The appellant contends that the trial court erred in removing for cause venireperson W.S. who stated that she was opposed to capital punishment. He argues that because the court never informed her that she would be provided guidelines by the court in determining whether to recommend death or life *110 imprisonment without parole and because she was never asked if she could consider the death penalty, it was error for the court to grant the state's challenge for cause. The record reflects that W.S. testified, in pertinent part, as follows:
"MR. GRADDICK: Did you respond on the questionnaire that the Court gave you that you were opposed to capital punishment?
"W.S.: No; I put on there that I didn't really believe in it, but if I had to, yeah.
"THE COURT: If you had to do it, you would?
"W.S.: Uh huh.
"MR. GRADDICK: Under what circumstances would you feel like you had to?
"W.S.: Well,
"MR. GRADDICK: You just don't know?
"W.S.: I just don't know.
"MR. GRADDICK: If you were given a choice between life without parole and capital punishment, would you automatically choose one over the other?
"W.S.: Uh huh, life without parole.
"MR. GRADDICK: Life without parole?
"W.S.: Uh huh.
"MR. GRADDICK: Even if the Judge charged you that under certain circumstances if you believe the evidence to be that you would have the right to sentence the person to die you would choose life without parole?
"W.S.: Yes, I would.
"....
"MR. GLASSROTH: [W.S.], there are some crimes that you can think of that are so terrible that you can conceivably see yourself imposing the sentence of death if given a choice?
"W.S.: Well, I just don't believe in taking another person's life."
"The standard for determining whether a prospective juror is disqualified from serving in a death penalty case is whether the prospective juror's views would `prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and oath.' Wainwright v. Witt, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985)."
Carroll v. State, 599 So.2d 1253, 1258 (Ala.Cr.App.1992), aff'd, 627 So.2d 874 (Ala.1993), cert. denied, 510 U.S. 1171, 114 S.Ct. 1207, 127 L.Ed.2d 554 (1994).
"The Eleventh Circuit Court of Appeals held in 1983 in McCorquodale v. Balkcom, 721 F.2d 1493 (11th Cir.1983), cert. denied, 466 U.S. 954, 104 S.Ct. 2161, 80 L.Ed.2d 546 (1984), that a prospective juror who responded to the death penalty questions, `I don't think I could do it. I really don't,' has made it sufficiently clear that she could not impose the death penalty regardless of the evidence....
"The Fifth Circuit in Martin v. Maggio, 711 F.2d 1273 (5th Cir.1983), even held that the following equivocal responses would establish the necessary predicate for disqualification: `I don't know if I would vote for the death penalty.' and `I don't know if I could do it.' These are all euphemistic expressions of `no.'"
Nichols v. State, 624 So.2d 1328, 1336 (Ala. Cr.App.1992) (quoting Watkins v. State, 509 So.2d 1071, 1073-74 (Ala.Cr.App.1986), aff'd, 509 So.2d 1074 (Ala.1987), cert. denied, 484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1988)).
It is apparent from W.S.'s responses that she did not believe in the death penalty and that she would have automatically chosen a sentence of life imprisonment without the possibility of parole over a sentence of death. Her responses showed that her views would have substantially impaired the performance of her duties as a juror. We find that the trial court did not err in granting the state's challenge for cause as to this venireperson.
In footnote 75 to his brief, the appellant raises the same arguments regarding venirepersons J.B., A.K., and D.H. We have reviewed the responses of these three venirepersons and, likewise, conclude that their views on the death penalty would have impaired the performance of their duties as jurors. The trial court did not abuse its discretion in granting the state's challenges for cause of these persons.
*111 The appellant's additional contention in the footnote that venirepersons J.B. and D.H. were misled by the prosecutor's voir dire questions is without merit. The voir dire examination of these two persons, in which the appellant's counsel also participated, was adequate from which to determine their views on capital punishment and was not misleading. The appellant's suggestion that the venirepersons, when being questioned about their views on capital punishment, should have been informed that the ultimate responsibility for imposing the death penalty did not lie with them but with the trial court is without merit. Any such instruction would have violated the holding in Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), that "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere."

XIV.
The appellant contends that reversible error occurred when he was put to trial under an indictment charging him with violating a capital murder statute that had been repealed. We note that this is the first time during the history of this case that the appellant has raised this issue. The Alabama Supreme Court, however, addressed this issue in its first Ala.R.App.P. 39(k) plain error review in Ex parte Bush, 431 So.2d at 563. The court noted that each count of the indictment in that case contained a miscitation of the statute under which the appellant was indicted. Each count alleged a violation of § 13A-5-31(a)(2), which was repealed effective July 1, 1981, and was replaced effective that same date by § 13A-5-40(a)(2). The Court found that the citation to § 13A-5-31(a)(2) was error because the charged crime occurred on July 26, 1981, 25 days after the effective date of the 1981 statute, and that § 13A-5-40(a)(2) was the applicable Code section. However, the Court held that the error was not of such legal significance as to require reversal; the appellant was not prejudiced by the miscitation, and the indictment adequately described the offense under the 1981 statute. The Court further found that the record affirmatively showed that the trial court and counsel for the respective parties, well before the trial date, acknowledged that the trial and the subsequent sentencing procedure would be governed by the 1981 statute.

XV.
The appellant contends that his third trial was barred by the Double Jeopardy Clause because his first retrial was necessitated by the prosecuting attorney's concealment of a police report containing information that shortly after the shooting Holmes identified a person other than the appellant as his assailant. This issue was not raised at trial and must be reviewed under the plain error rule. As we have previously noted, the appellant's first conviction was set aside and a new trial ordered as a result of the conditional granting of a habeas corpus petition by the federal district court. The petition was granted because there had been a dispute as to whether the prosecution had given to the defense a police memorandum showing that the only eyewitness to the murder, in a lineup, had identified a person other than the appellant as the assailant. The record does not support the appellant's contention that the prosecutor intentionally concealed the memorandum. Rather, it shows only that the prosecution either failed, through oversight, to divulge the information or that the prosecution turned it over to defense counsel, who then failed to use it at trial. It is interesting to note that the appellant had the information and used it in his second and third trials, to no avail.
The Double Jeopardy Clause does not bar retrial of a defendant who succeeds on appeal in getting his conviction set aside for trial error, except when the conviction is reversed on failure of sufficiency of evidence to sustain the verdict. Terrell v. State, 429 So.2d 656 (Ala.Cr.App.1982). "That a defendant's conviction is overturned on collateral rather than direct attack is irrelevant for ... purposes of deciding the retrial issue." United States v. Tateo, 377 U.S. 463, 466, 84 S.Ct. 1587, 1589, 12 L.Ed.2d 448 (1964) (retrial *112 permitted after conviction set aside on habeas corpus review); quoted in Staatz v. Dupnik, 789 F.2d 806, 808 (9th Cir.1986) (retrial permitted when conviction set aside pursuant to state post-conviction relief procedures because trial court gave an improper jury instruction). The appellant bases his argument that the Double Jeopardy Clause precluded his retrial after his successful habeas corpus petition on cases involving prosecutorial overreaching and misconduct, which we do not have in this case. These cases are distinguishable from the instant case. We find no plain error here.

XVI.
The appellant contends that the trial court erred, during the guilt phase of the trial, in not instructing the jury on the allegedly lesser included offenses of felony-murder and manslaughter; in instructing the jury to reconcile the witnesses' testimony if possible, which, he argues, created a presumption in favor of guilt; in failing to specify, in the instructions, the property that was allegedly taken; and in instructing the jury as it did on reasonable doubt, circumstantial evidence, and accomplice liability. No objection was raised in the court below as to any of these instructions except the instruction on accomplice liability. Where no objections were made, we will review those issues under the plain error rule. Plain error arises only if the error is so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings or if it has or probably has adversely affected a substantial right of the appellant. Ala.R.App.P. 45A; Ex parte Womack, 435 So.2d 766, 769 (Ala.), cert. denied, 464 U.S. 986, 104 S.Ct. 436, 78 L.Ed.2d 367 (1983).
In specific regard to the appellant's assertion that he was entitled to jury instructions on felony-murder and manslaughter, we note:
"A charge on a lesser included offense should be given when there is a reasonable theory from the evidence to support such a proposition. Ex parte Julius, 455 So.2d 984 (Ala.1984), cert. denied, 469 U.S. 1132... [105 S.Ct. 817, 83 L.Ed.2d 809] (1985). Clark v. State, 451 So.2d 368 (Ala.Cr.App.1984). A trial judge, however, may refuse to charge on a lesser included offense when it is clear to the judicial mind that there is no evidence to support such a charge. Mullis v. State, 545 So.2d 205, 211 (Ala.Crim.App.1989); Gurganus v. State, 520 So.2d 170 (Ala.Crim.App.1987). A court should not charge the jury on a lesser included offense `unless there is a rational basis for a verdict convicting the defendant of the included offense.' Ala.Code 1975, § 13A-1-9(b).
"Furthermore, an accused is not entitled to a charge on a lesser included offense when he denied committing the crime itself and the State's evidence does not support such a charge. Daly v. State, 442 So.2d 143 (Ala.Crim.App.1983); Williams v. State, 377 So.2d 634 (Ala.Crim.App.), cert. denied, 377 So.2d 639 (Ala.1979)."
Dill v. State, 600 So.2d 343, 352-53 (Ala.Cr. App.1991), aff'd, 600 So.2d 372 (Ala.1992), cert. denied, 507 U.S. 924, 113 S.Ct. 1293, 122 L.Ed.2d 684 (1993).
In its jury instructions in the guilt phase, the trial court instructed the jury on murder as a lesser included offense of the capital crime charged in the indictment. The appellant raised no objection to this portion of the oral charge and, in fact, announced "satisfied" on two occasionsupon conclusion of the jury instructions and again when the pertinent instructions were repeated in response to a question from the jury during its deliberations. Furthermore, the appellant did not request the trial court to instruct on felony-murder and manslaughter. Although there was some evidence that the appellant had consumed drugs shortly before the commission of the charged crime, the trial court was not requested to and did not instruct on the legal principles of intoxication in connection with criminal liability. It is clear that the appellant's defense strategy was to convince the jury that he had not been involved in the commission of the crime: he endeavored to place the blame on Cornelius Pringle and Edward Pringle; he asked the jury not to believe his confession because of alleged coercion; he suggested that Patricia Pringle was motivated to lie; and he urged the jury to believe that Tony Holmes's identification *113 of Cornelius Pringle as the assailant was accurate. He made no claim that he had been unable to form the intent to kill because of intoxication. His defense strategy was simply that he was not there. In his closing argument, he referred to the verdicts that the jury could return as capital murder, murder, and not guilty. Instructions on the offenses of felony-murder and manslaughter would have been inconsistent with his trial strategy. Nevertheless, he now raises the issue for the first time on appeal. He now contends that the trial court erred in not instructing the jury on felony-murder and manslaughter sua sponte.
Under the plain error review standard, we find that, under the circumstances here, the trial court's failure to instruct the jury on felony-murder and manslaughter and on the principles of voluntary intoxication was not such an error, if error at all, as would seriously affect the fairness or integrity of the proceedings or adversely affect a substantial right of the appellant. Where the instructions requested would have conflicted with defense strategy, there is no error in the trial court's failure to give the instructions. Gurley v. State, 639 So.2d 557 (Ala.Cr.App.1993); Hunt v. State, 659 So.2d 933 (Ala.Cr.App.1994), aff'd, 659 So.2d 960 (Ala.), cert. denied, ___ U.S.___, 116 S.Ct. 215, 133 L.Ed.2d 146 (1995); Hutcherson v. State, 677 So.2d 1174 (Ala.Cr.App.1994). See also United States v. Chandler, 996 F.2d 1073, 1099 (11th Cir.1993), cert. denied, 512 U.S. 1227, 114 S.Ct. 2724, 129 L.Ed.2d 848 (1994) (court has no duty to offer sua sponte instruction on lesser offense of murder-for-hire when defendant, charged with murder while engaged in and in furtherance of continuing criminal enterprise, may have made strategic decision not to request murder-for-hire instruction); Kubat v. Thieret, 867 F.2d 351, 365-66 (7th Cir.), cert. denied, 493 U.S. 874, 110 S.Ct. 206, 107 L.Ed.2d 159 (1989) (court has no duty sua sponte to offer instruction on lesser included offense of unlawful restraint when defendant, charged with murder and kidnapping, may have made strategic decision not to request unlawful restraint instruction).
The appellant also contends that the trial court's instruction concerning the credibility of witnesses, which was as follows, was error because it created a presumption that the witnesses were telling the truth:
"How do you determine the truth? The law helps some there. The law says you're entitled to consider what these witnesses said and how they said it. Were they willing, too willing, or unwilling? Were they candid with you or evasive? Did their testimony ring true? You're the sole judges of the credibility, we call it. You're the sole judges on whether these witnesses told you the truth. Now, the law says that you're entitled to consider both what they said and how they said it in finding and seeking and determining the truth. The law says when these witnesses come in here and take the oath to tell you the truth, tell me the truth, they're supposed to tell us the truth. So we should reconcile all of the testimony to make it all speak the truth, if we can. If you can't do that, then it is up to you as finders of the truth, to separate the truthful part from the part, if any, that you find not to be the truth, and base your verdict, of course, only on the truth. If you find that a witness willfully testified to you falsely on any material matter, the law says you're entitled to disregard the witness's entire testimony, if you want to; or again you can separate the truthful part from the part, if any, you find not to be the truth and base your verdict, of course, only on the truthful, the credible, the believable testimony."
We find that, taking this instruction as a whole, it was a correct statement of the law and was not misleading. We do not agree with the appellant's analysis of the instruction. The cases relied upon by the appellant are distinguishable from the instant case. We find no plain error in the giving of this instruction.
The appellant contends that the trial court erred in failing to instruct the jury as to the specific property, including the value of the property, that, he says, the jury was required to find he had stolen before it could find him guilty. Counts I and II of the indictment alleged, "a theft of property, towit: *114 two bags of Zodiac sign tags, a better description of which is unknown to the grand jury, [and] the value of which is unknown to the grand jury." Counts III and IV allege, "a theft of property, to-wit: the kind, amount or value otherwise unknown to the grand jury, a better description of the property is otherwise unknown to the grand jury."
When robbery was a common law crime in Alabama, a "taking" was required, Wilson v. State, 268 Ala. 86, 105 So.2d 66 (1958), although the amount or value of the property taken was immaterial, Sanders v. State, 289 Ala. 224, 266 So.2d 802 (1972). However, our present robbery statutes do not require a "taking" of property, Grace v. State, 431 So.2d 1331 (Ala.Cr.App.1992). Sections 13A-8-40 through -44 and the indictment in a robbery case need not allege an actual theft to constitute the offense. The operative words of the current robbery statute are "in the course of committing a theft," which includes an attempted theft. Grace v. State. Moreover, under our present robbery statute, the value of the property is immaterial. We find that the robbery portions of the four counts of the indictment sufficiently charged the offense of robbery in the first degree or an attempted robbery in the first degree. § 13A-5-40(a)(2). See our discussion of the allegations of robbery in the indictment in Part IX above. The appellant contends in a footnote to his brief to this court that the trial court's instruction constituted an unlawful amendment to the indictment. We do not agree. We find no plain error in these contentions.
The appellant contends that the jury instruction on reasonable doubt violated the holding of the United States Supreme Court in Cage v. Louisiana, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990). The appellant argues, in effect, that a reasonable juror could have interpreted the instruction to allow a finding of guilt based on a degree of proof below that required by the Due Process Clause. The trial court's instruction on reasonable doubt was as follows, with the portion to which the appellant specifically objects emphasized:
"The law says that everybody in this country, Mr. Bush here included, is innocent of any and all offenses. He does not have to prove that he is innocent. The law says that for him. The law says that for everyone.... The law says everybody is innocent; and that innocence continues throughout the trial of these cases. It continues until or it continues unless the State proves to you beyond a reasonable doubt all of the elements necessary to constitute guilt. So that means that he does not have to say anything. The law says all of that for him; and he continues to be innocent unless or until the State proves to each and every one of you all of the elements necessary to constitute guilt; and the State must prove that to you beyond a reasonable doubt. The burden never shifts to the defendant to do anything. The State must prove to you beyond a reasonable doubt. Beyond a reasonable doubt is a term that addresses itself to your good common sense. And those words as defined by your common sense definition are just as good, if not better, than these legal definitions that us judges and lawyers use; but logically beyond a reasonable doubt means beyond a doubt for which there is a reason, beyond a doubt for which there is a reason, a real reason that you have from that stand to cause you to doubt that he is guilty.

"....
"... The law says that the State must prove to you beyond a reasonable doubt, beyond a doubt for which there is a reason that comes from the stand. Based on all of the evidence, part of the evidence, or lack of evidence do you have a reason to cause you to doubt that he's guilty of capital murder? If you do, then you look to the murder, lesser included. If you have a reason that comes from the stand that causes you to doubt that he is guilty of murder, he'd be entitled to an acquittal. On the other hand, if you consider all of the evidence and you do not have a reason from that stand to cause you to have a doubt that he is guilty of capital murder, then your verdict would be guilty. If you do have a reason to cause you to doubt that he is guilty of capital murder, you can look then to the lesser included; and if you *115 don't have a reason to cause you to doubt that he is guilty of intentional murder, then your verdict would be guilty of murder. Or if you have a reason to doubt that he's guilty of either capital murder or murder, your verdict would be not guilty.
"Now, the law says the State must prove this guilt to you beyond a reasonable doubt, beyond a doubt for which there is a reason. The law says the State does not have to prove guilt to you beyond all doubt. The State does not have to prove guilt to a mathematical certainty; but beyond a doubt for which there is a reason, not a doubt that you reach for, or grope for, or surmise or [a] conjectural thing, but one that freely and naturally comes from what you heard, all, part or lack of what you heard.
"Under the law your verdict must be based on the facts, based on the truth, not on suspicion. Whatever your verdict is it can't be based on surmise or suspicion or guesswork; but on the truth of the matter."
In reviewing the reasonable doubt instruction in this case, we do so in the context of the charge as a whole. Haney v. State, 603 So.2d 368 (Ala.Cr.App.1991), aff'd, 603 So.2d 412 (Ala.1992); cert. denied, 507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993). So long as the definition of "reasonable doubt" in the charge correctly conveys the concept of reasonable doubt, the charge will not be considered so prejudicial as to require reversal. Holland v. United States, 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150 (1954); Haney v. State.
In reviewing the reasonable doubt instruction in the context of the charge as a whole, we do not find that the language complained of could have been interpreted by a reasonable juror to allow a finding of guilt based on a degree of proof below that degree required by the Due Process Clause, i.e., proof beyond a reasonable doubt of every fact necessary to constitute the crime with which the accused is charged. In re Winship, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). Cage v. Louisiana is distinguishable from this case. We think that the definition of reasonable doubt given the jury in this case correctly conveyed the concept of reasonable doubt and was not misleading or confusing. The instruction is not constitutionally deficient as contended by the appellant. We find no plain error in this instruction.
The appellant contends that the trial court's instruction to the jury on circumstantial evidence "erroneously diminished the state's burden of proof ... by suggesting that if certain predicate facts were proved beyond a reasonable doubt, [the jury] could also find other facts if the latter `naturally and reasonably flowed' from the predicate facts." In reference to circumstantial evidence, the trial court instructed the jury as follows:
"When we talk about what someone intends, what is someone's purpose, that's looking into somebody else's head. And rarely, if ever, can we have direct proof of such elements as what someone means to do, what someone intends to do. You're entitled to consider everything you've heard from that stand, the totality we call it, of everything you heard. You're entitled to consider the circumstances. We call that circumstantial evidence. And from which a jury may infer other connective facts which though not actually proven do reasonably come from the facts they did prove. That is as opposed to direct proof. And circumstantial evidence is properly before you and should be considered by you, along with all the other evidence; and a conviction can be based on circumstantial evidence if the State has proven beyond a reasonable doubt the facts upon which the inference is drawn, and if the other facts do naturally flow from what they did prove. In other words, if they prove A to you beyond a reasonable doubt, if the State does, and if the State proves B to you beyond a reasonable doubt, you're entitled to infer, therefore, C if C does naturally and reasonably flow or come from what they did prove."
We have reviewed this instruction in the light of the entire charge, and conclude that it was neither improper, misleading, nor confusing. We find no plain error in the giving of this instruction.
*116 The appellant contends that the trial court's instruction on accomplice liability allowed the jury to convict him of capital murder without the required finding that he possessed the intent to kill. He objected at trial to the court's instruction on accomplice liability, but only on the basis that the accomplice liability statute in capital cases was unconstitutional. The issue now raised was not raised at trial and, thus, must be reviewed under the plain error rule. The trial court's instruction on accomplice liability was as follows:
"... [I]f you find that the murder of the intentional killing type, the murder of Larry Dominguez, was committed by someone other than the defendant, the defendant is guilty of that intentional killing type if, but only if, you find beyond a reasonable doubt either that the defendant intentionally procured, induced or caused the other person to commit the murder, or that the defendant intentionally aided or abetted the other person's commission of the murder, only if you're convinced beyond a reasonable doubt either that both of those situations exist as a fact, either or both, can you find the defendant guilty of an intentional killing, murder, which he didn't personally commit himself. A defendant who is guilty of the crime of murder of the intentional killing type because of these principles has committed that crime the same as if he had personally done the killing himself."
We find no merit in the appellant's contention. This instruction was correct. The trial court clearly instructed the jury that it must find that the appellant intentionally aided or abetted the commission of the murder before the jury could convict him of the offense as an accomplice. There was no plain error in the giving of this instruction.
In footnote 89 to his brief to this court, the appellant raises an issue for the first time, as follows:
"[T]he circuit court erred in its response to a question from the jurors, during their guilt-phase deliberations, as to how Mr. Bush's sentence would be decided were he convicted of capital murder. By failing to make clear, in this answer or in any previous instruction to the jurors, that they could only recommend a sentence and that the court [would] make the final decision whether Mr. Bush [would receive] the death penalty, the trial judge created an intolerable risk that a deadlocked jury reached a compromise verdict, with certain jurors agreeing to convict Mr. Bush of capital murder in the mistaken belief that a promise by other jurors to vote in favor of life-without-parole verdict would preclude a death sentence in the case."
The record shows that, after commencing its deliberations during the guilt phase, the jury asked the trial court for some clarification of the proceedings. The record does not contain its request. We can discern from the trial court's response that it pertained to the sentencing proceedings. The trial court then stated to the jury:
"The law provides that if a defendant is convicted of a capital offense additional proceedings will be held to determine whether his punishment is to be life in prison without parole or death; but you're not to concern yourself at this time with any issue of punishment. Instead the only determination that you are to make at this time is whether the State has proven beyond a reasonable doubt that the defendant is guilty of the capital offense or some lesser offense, as I have defined the lesser offense here, murder, intentional murder. So the only determination you're to make at this time is whether the State has proven beyond a reasonable doubt that the defendant is guilty of the capital offense, or whether he's guilty of murder, or whether he's not guilty."
We find no merit in the appellant's contention. His assertions are purely speculative and are not supported by the record. The trial court's instruction that the jury during the guilt phase should not be concerned with sentencing, but should be concerned only with the question of guilt or innocence was correct, and in the absence of some evidence to the contrary, it should be presumed that the jury complied with that instruction. Throughout the trial of the case, the appellant urged the trial court not to use the word "recommend" in referring to the jury's responsibility in sentencing, claiming that it *117 violated Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). Now, for the first time, he claims that the trial court should have so instructed the jury sua sponte. We note that he did not object to the trial court's instructions to the jury and, in fact, stated that he was satisfied with them. We find no plain error in the trial court's instructions.

XVII.
The appellant contends that the state failed to prove the corpus delicti "necessary to sustain a conviction for capital murder because it offered no evidence of a robbery outside of Mr. Bush's confessions." He argues that, aside from his confessions, the state presented no evidence that he stole "zodiac sign tags" or anything else from Dominguez, Holmes, or the Majik Market on the night of the killing of Dominguez.
When the confessions were offered into evidence, the appellant did not object on the ground that the state had failed to prove the corpus delicti. While the appellant moved for a judgment of acquittal at the conclusion of the state's case-in-chief on the ground that the evidence was insufficient to support a conviction for murder committed during the course of a robbery or an attempted robbery, he did not specifically raise the issue whether the state had proven the corpus delicti of the crime charged. The corpus delicti issue is specifically raised for the first time on appeal. However, the motion for a judgment of acquittal on sufficiency of the evidence grounds preserved the issue for review because a confession or admission alone cannot support a conviction. Watters v. State, 369 So.2d 1262 (Ala.Cr.App.1978), rev'd on other grounds, 369 So.2d 1272 (Ala.1979).
"It is a settled principle of law that a mere extrajudicial confession, uncorroborated by other facts, is insufficient to show the corpus delicti and cannot support a conviction." Id., at 1271. "In a charge of crime, whether felony or misdemeanor, the state is not entitled to go to the jury on proof of the accused's extrajudicial confession without evidence, independent of the confession, warranting a reasonable inference of the existence of the corpus delicti of the charged crime." C. Gamble, McElroy's Alabama Evidence § 304.01 (4th ed. 1991) (footnotes omitted). The corpus delicti may not be established by a confession or an admission standing alone. A confession or an admission alone cannot support a conviction, but must be corroborated by independent evidence of the corpus delicti. C. Torcia, Wharton's Criminal Law § 28 (14th ed. 1978); 7 Wigmore, Evidence §§ 2071-74 (Chadbourn rev. 1978). The wisdom of this rule lies in the fact that no man should be convicted of a crime, the commission of which he confesses, unless the state shows, by testimony other than the accused's confession, that the confessed crime was in fact committed. East v. State, 146 Tex.Crim. 396, 175 S.W.2d 603 (1942). "The corpus delicti consists of two elements: (1) That a certain result has been produced ... and (2) that some person is criminally responsible for the act." Gamble, supra, at § 304.01 (quoting State v. Thomas, 78 Ariz. 52, 59, 275 P.2d 408, 413 (1954)).
"It is clear from the foregoing definition that the term corpus delicti does not mean or include the guilty agency of the accused in the commission of the alleged crime for which he is being tried.
"Independent evidence of the corpus delicti need not be of such probative strength as that such evidence, standing alone, in the opinion of the trial or appellate court, would, ought to or probably would satisfy a jury beyond a reasonable doubt of the existence of the corpus delicti. Independent evidence of the corpus delicti may consist solely of circumstantial evidence. Whether the independent evidence tending to prove the corpus delicti is sufficient to warrant a reasonable inference of the existence thereof depends, of course, upon the particular facts of each case. It is for the judge, not the jury, to determine whether there is evidence independent of accused's confession, warranting a reasonable inference of the existence of the corpus delicti."

McElroy's, supra, § 304.01 (footnotes omitted).
"[I]nconclusive facts and circumstances tending prima facie to show the corpus delicti *118 may be aided by the admissions or confession of the accused so as to satisfy the jury beyond a reasonable doubt, and so to support a conviction, although such facts and circumstances, standing alone, would not thus satisfy the jury of the existence of the corpus delicti." Bridges v. State, 284 Ala. 412, 417, 225 So.2d 821, 826 (1969). See also Watters v. State; Thompson v. State, 358 So.2d 1069, 1071 (Ala.Cr.App.1978).
"Evidence of facts and circumstances, attending the particular offense, and usually attending the commission of similar offensesor of facts to the discovery of which the confession has led, and which would not probably have existed if the offense had not been committedor of facts having a just tendency to lead the mind to the conclusion that the offense has been committedwould be admissible to corroborate the confession. The weight which would be accorded them, when connected with the confession, the jury must determine, under proper instructions from the court."
Matthews v. State, 55 Ala. 187, 194 (1876).
It is undisputed that Dominguez was murdered in the Majik Market, and the evidence clearly established the corpus delicti of murder. However, the issue presented here is whether this murder was committed during a robbery in the first degree or an attempted robbery, making the offense a capital offense. A defendant commits robbery in the first degree if "in the course of committing a theft he ... [u]ses force against the person of the owner or any person present with intent to overcome his physical resistance or physical power of resistance," § 13A-8-43, and he "[i]s armed with a deadly weapon or dangerous instrument" or "causes serious physical injury to another," § 13A-8-41.
Here, again, the evidence is undisputed that Dominguez's assailant used force and caused his death by means of a deadly weapon or dangerous instrument. However, in determining whether a robbery or an attempted robbery was committed, the important question presented is whether the assailant was, at the time he used force against Dominguez, "in the course of committing a theft." Section 13A-8-40(b), defines that phrase, as follows: "In the course of committing a theft embraces acts which occur in an attempt to commit or the commission of theft, or in immediate flight after the attempt or commission."
The capital crime of the intentional killing of the victim during a robbery or an attempted robbery is a single offense beginning with the act of robbing or attempting to rob and culminating with the intentional killing of the victim. The offense consists of two elements, robbing and intentionally killing. Davis v. State, 536 So.2d 110 (Ala.Cr.App. 1987), aff'd, 536 So.2d 118 (Ala.1988), cert. denied, 490 U.S. 1028, 109 S.Ct. 1766, 104 L.Ed.2d 201 (1989); Magwood v. State, 494 So.2d 124 (Ala.Cr.App.1985), aff'd, 494 So.2d 154 (Ala.), cert. denied, 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 599 (1986).
"As the Alabama Supreme Court held in Cobern v. State, 273 Ala. 547, 142 So.2d 869 (1962), `the fact that the victim was dead at the time the property was taken would not militate [against a finding] of robbery if the intervening time between the murder and the taking formed a continuous chain of events.' Clements v. State, 370 So.2d 708, 713 (Ala.Cr.App.1978), affirmed in pertinent part, 370 So.2d 723 (Ala.1979); Clark v. State, 451 So.2d 368, 372 (Ala.Cr. App.1984). To sustain any other position `would be tantamount to granting to would be robbers a license to kill their victims prior to robbing them in the hope of avoiding prosecution under the capital felony statute.' Thomas v. State, 460 So.2d 207, 212 (Ala.Cr.App.1983), affirmed, 460 So.2d 216 (Ala.1984).
"Although a robbery committed as a `mere afterthought' and unrelated to the murder will not sustain a conviction under § 13A-5-40(a)(2) for the capital offense of murder-robbery, see Bufford v. State, [382 So.2d 1162 (Ala.Cr.App.), cert. denied, 382 So.2d 1175 (Ala.1980)]; O'Pry v. State, [642 S.W.2d 748 (Tex.Cr.App.1981)], the question of a defendant's intent at the time of the commission of the crime is usually an issue for the jury to resolve. Crowe v. State, 435 So.2d 1371, 1379 (Ala.Cr.App. 1983). The jury may infer from the facts *119 and circumstances that the robbery began when the accused attacked the victim and the capital offense was consummated when the defendant took the victim's property and fled. Cobern v. State, 273 Ala. [at] 550, 142 So.2d [at] 871 ... (1962). The defendant's intent to rob the victim can be inferred where `[t]he intervening time, if any, between the killing and robbery was part of a continuous chain of events.' Thomas v. State, 460 So.2d at 212.... See also Cobern v. State; Crowe v. State; Bufford v. State; Clements v. State."
Hallford v. State, 548 So.2d 526, 534-35 (Ala. Cr.App.), aff'd, 548 So.2d 547 (Ala.1988), cert. denied, 493 U.S. 945, 110 S.Ct. 354, 107 L.Ed.2d 342 (1989) (quoting Connolly v. State, 500 So.2d 57, 63 (Ala.Cr.App.1985), aff'd, 500 So.2d 68 (Ala.1986)).
The appellant's intent to commit a theft in the Majik Market can be reasonably inferred from the facts and circumstances surrounding the offense. The offense was a typical convenience store robbery, where the clerk is gunned down execution style so that there will be no witness, which unfortunately has become a common occurrence in our society. The circumstances surrounding the shooting of Dominguez and Holmesthe time and the location, the use of a pistol, the appellant's obvious impression that the only person in the store at the time was the lone clerk, the appellant's ordering Holmes to go back to the bathroom, and the appellant's flight from the area in a getaway carhave the tendency to lead one to conclude that the appellant was there to rob. The facts and circumstances surrounding the offense subsequently committed in the Seven-Eleven store, which is connected with the charged offense as a part of the continuing transaction, support this conclusion. Adams, the clerk of the Seven-Eleven store, was shot execution style with the same pistol that killed Dominguez and wounded Holmes and under similar circumstances. In the case of the Seven-Eleven store, the clerk was killed instantly; there was no witness to tell what had happened. When the crime was discovered at the Seven-Eleven store, the cash register was open, and a package of Kool cigarettes in a paper bag with a cash register receipt attached showing a sale about the time of the killing was found on the floor. These facts support a reasonable conclusion that a theft or attempted theft of money occurred in the Seven-Eleven store, which in turn supports a reasonable conclusion that when the appellant entered the Majik Market and used force against Dominguez, he intended to rob. When the officers arrived at the Majik Market after the shooting, they discovered that the cash register was closed. Holmes, who was familiar with the Majik Market, testified that the "zodiac sign tags" were kept in a rack behind the counter where the cash register was located.
While the facts and circumstances surrounding the offense may be inconclusive without the appellant's confessions, they do tend to prima facie show the corpus delicti of robbery or an attempted robbery. However, when the confessions and admissions of the appellant are considered as an aid in determining the corpus delicti, which under the circumstances here is proper, the evidence was clearly sufficient for the court and jury to find the existence of the corpus delicti. The appellant stated in his confessions that he entered the Majik Market and shot Dominguez and Holmes in an attempt to get money; that when he was unable to get into the cash register after shooting Dominguez, he took the zodiac sign tags from their location on the wall behind the counter near the cash register; that because he and his accomplice were unsuccessful in getting money from the Majik Market, they attempted to get money a short time later in the Seven-Eleven store nearby; that he purchased a package of Kool cigarettes at the Seven-Eleven store, and when Adams opened the cash register to receive payment, he pointed the pistol at Adams and told him it was a "stick up"; and that he forced Adams to an office in the rear, shot him, and took $20 to $30 from the cash register and some checks and a money bag from the store. The appellant admitted to Patricia Pringle, the wife of the accomplice, that he shot the persons in the convenience stores and said that he did it because he "couldn't have anybody looking." The pistol used in the commission of both offenses was traced to the appellant and was recovered. Through his accomplice, Edward *120 Pringle, the appellant was linked to the getaway car described by Holmes.
After considering the confessions of the appellant, which we have found to be voluntary, along with the facts and circumstances surrounding the offenses, we find that the state proved the corpus delicti of robbery or an attempted robbery. As we stated earlier, the appellant's intent to commit a theft can be inferred from the facts and circumstances surrounding the commission of the acts. He obviously entered the premises with the intent to steal money and anything else that struck his fancy. The evidence of the location of the zodiac sign tags supported by the appellant's confessions coupled with all the other facts and circumstances established the corpus delicti as to Counts I and II of the indictment. Even if no valuables had been taken, it would not necessarily mean that there had been no attempted robbery or indeed no robbery. The lack of direct evidence of a taking of property does not undermine the conviction for murder committed during a robbery, because the robbery statutes proscribe attempts as well as completed thefts. Johnson v. State, 473 So.2d 607 (Ala. Cr.App.1985). The facts and circumstances clarified by the appellant's confessions also establish the corpus delicti of an attempted robbery as to Counts III and IV. Further, the evidence presented by the state was sufficient from which the jury could find the appellant guilty beyond a reasonable doubt under either or under all of the counts of the indictment of robbery of the Majik Market. We finally note that it can reasonably be inferred from the evidence in this case that the robbery or an attempted robbery and the murder formed a continuous chain of events. The trial court's order overruling the motion for a judgment of acquittal was correct. The case was properly submitted to the jury.
In a footnote to his brief in his discussion of this issue, the appellant contends that the trial court erred in failing to instruct the jury that it could not convict him absent sufficient evidence to corroborate his confession with respect to each element of the charged offense. This issue was not raised in the trial court. No charge pertaining to the corroboration of the confessions was requested, and no objection was raised to the court's jury charge on this ground. Thus, we review this contention under the plain error rule.
"[I]t is the province of the judge to determine whether there is testimony sufficient to make it appear prima facie that the offense has been committed. The evidence on which the judge acts may not necessarily establish the corpus delicti. It may be, and often is, conflicting and contradictory. In such case, the credibility of the witnesses and the sufficiency of the entire evidence are for the ultimate decision of the jury."
McDowell v. State, 238 Ala. 101, 105, 189 So. 183, 185 (1939); Gamble, supra, § 304.01. Here, we have found that the state presented evidence sufficient not only to prove the corpus delicti of murder committed during the course of a robbery or an attempted robbery, but also to make out a prima facie case to be submitted to the jury. The fact that the trial court did not instruct the jury on the law of corpus delicti, under the circumstances here, did not constitute error, much less plain error.

XVIII.
The appellant contends that the trial court erred in admitting evidence of the robbery-murder that occurred in the Seven-Eleven store. He argues that this subsequent crime was unrelated to the charged crime and that the admission of evidence pertaining to that crime violated the general exclusionary rule prohibiting the introduction of such evidence. He also contends that the prosecutor's argument to the jury concerning this subsequent crime was error and highly prejudicial. We find no merit in these contentions.
As we have previously stated in Part I, the evidence of the murder and robbery of the Seven-Eleven store was admissible under the res gestae or continuing transaction exception and under the intent and motive exceptions to the general exclusionary rule. We conclude that the evidence of the subsequent crime was relevant, was reasonably necessary to the state's case, and was plain and conclusive, and that its probative value *121 outweighed any potential prejudicial effect. The trial court did not abuse its discretion in admitting this evidence.
If the accused's commission of another crime is admissible in a prosecution, the state may prove in detail the manner in which the accused committed the other crime. Weatherford v. State; Gamble, supra, § 69.02(8). Here, it was proper for the prosecution to comment on the details of the subsequent crime and to draw any reasonable inferences therefrom in its arguments to the jury. After reviewing the arguments of the prosecution in this regard, we do not find them to be improper. We note that the impact of the evidence of the robbery-murder committed at the Seven-Eleven store was considerably reduced by the trial court's instruction to the jury that it was "not to consider the evidence of the ... Adams shooting as direct or substantive evidence of the guilt of William Bush of the crime alleged in the indictment."
The appellant contends in footnote 103 to his brief to this court that the evidence of the subsequent crime was improperly admitted because, he says, he was not given prior notice that the state intended to offer that evidence. We find no merit in this contention. The evidence was admitted at the two prior trials of this case, and its use here certainly came as no surprise to the appellant.

XIX.
The appellant contends that his inculpatory statements to the police, which when considered together amounted to full confessions to the commission of the three crimes, should have been suppressed because, he argues, they were obtained after his allegedly illegal arrest, without Miranda warnings, and after the failure of the officer to honor his request to remain silent, and they were involuntary because they were made as the result of threats and coercion. These identical issues arose in the second trial of this case and were addressed at length in Bush II, 523 So.2d at 543-57. In holding that the confessions were properly admitted in the second trial, we determined in Bush II that the appellant's arrest was proper; that he failed to assert his right to remain silent, but instead waived it; and that his confessions were knowingly and voluntarily made with proper Miranda warnings. We reaffirm and adopt our holding in Bush II in reviewing the trial court's ruling in this third trial because, in this third trial, the parties presented no new evidence or arguments, but stipulated that the transcript of the evidence presented at the suppression hearing in the second trial would be made a part of the record and would constitute the facts upon which the trial court would rule on the appellant's motion to suppress. No reason has been shown why we should now change our decision. See also our treatment of the admissibility of the confessions in our introductory rendition of the facts, supra.
The appellant contends for the first time that he was subjected to an illegal seizure or stop when on the evening before his arrest, he was approached and questioned by Lieutenant Ward and another officer on the street near his home. He argues that, as a result of this 10-minute encounter, the police obtained information from him about his prior criminal record, where he lived, and other facts that played a part in their decision to arrest him at his home the following night, an arrest which, he says, led to inculpatory custodial statements by him.
This issue was not raised in the trial court and, hence, we must review it under the plain error rule.
Lieutenant Ward testified as follows concerning the encounter:
"Q. [MR. BELSER, prosecutor]: Now, when was your first contact with William Bush?
"A. I believe it was on 8-27-81.
"....
"Q. The 27th?
"A. Yes, sir. It could have been the 26th. I would have to refer back to my notes.
"Q. Tell the jury what the circumstances were around your first contact with him.
"A. Well, the first contact, myself and Sgt. Billingsly ... were riding on the Western Boulevard around Mobile Highway. We had had information which we were unable to support the information, *122 that the subject who was involved in the crime lived in one of the houses in Smiley Court. So we had ridden through Smiley Court a couple of times just hoping we might see something that would make us think we needed to talk to this person or that person, or maybe spot one of the vehicles that we were looking for in the case. On this particular night we observed William Bush and a child on a motorcycle coming out of Smiley Court, one of the first few houses as you go into Smiley Court. His general build and so forth matched the general description. We were going to stop him and just talk to him. We stopped him. He got off the motorcycle. We asked him for his name, just personal type information. We had no reason to really talk to him about the case at that time because we had no information that he was involved.
"Q. Did you talk to him about the case?
"A. No, sir. We just strictly got his name and his address and if he had ever been in jail before, ever been arrested. I think we ran him to see if he had any outstanding warrants on him. And it lasted about ten minutes."
From the time these crimes were committed, the police began a search of the city for someone who matched Holmes's description of the perpetrator and for the automobile described by Holmes. According to Ward, the procedure followed in the city-wide search was for all officers to be on the lookout for anyone and any vehicle matching Holmes's descriptions and if an officer saw anyone or any vehicle matching the descriptions was observed, the information was to be reported so that a detective could follow it up. At the time of the stop, the officers had no evidence linking the appellant with the crimes.
Lieutenant Ward had previously testified about this encounter with the appellant at the suppression hearing during the second trial, and he had given a slightly different version. He testified to the following at the earlier hearing: He and Sergeant Billingsly had information from an informant that Edward Pringle and someone named "Chick" had committed the crimes and that "Chick" lived in Smiley Court; the informant went with them in their vehicle and pointed out where "Chick" lived, which was 4200-B Smiley Court; at that time they noticed a motorcycle in the carport; and when they returned to get the motorcycle's license number, they observed the appellant and a child on the motorcycle. The record of the second trial's suppression hearing contains the following stipulation as to what the informant is reputed to have told Ward and Billingsley: Upon seeing a composite drawing of a suspect in the crimes, he went to the police station and told Ward and Billingsley that in his judgment the composite drawing was of Edward Pringle and that if there had been an accomplice involved, he thought it would be "Chick" Bush; he went with the officers and pointed out "Chick" Bush's house to them and also told them that he knew Edward Pringle and his wife; that Edward Pringle's wife had a white-over-green Monte Carlo automobile; and that he had seen Edward Pringle driving it.
In addressing the appellant's contention that he was subjected to an illegal seizure in violation of his rights under the Fourth Amendment, we are guided by the following:
"`It is well settled that not every encounter between police officers and citizens constitutes a seizure within the protection of the Fourth Amendment. United States v. Mendenhall, 446 U.S. 544, 554, 100 S.Ct. 1870, [1877] 64 L.Ed.2d 497 (1980); Terry v. Ohio, 392 U.S. 1,19, n. 16, 88 S.Ct. 1868, 1879, n. 16, 20 L.Ed.2d 889 (1968). "There is nothing in the Constitution which prevents a policeman from addressing questions to anyone on the streets." Terry, 392 U.S. at 34, 88 S.Ct. at 1886 (Justice White, concurring). A stop "of a restricted investigative scope conducted in a noncoercive manner ... [does] not trigger Fourth Amendment protection at all." United States v. Willis, 759 F.2d 1486, 1495 (11th Cir.), cert. denied, 474 U.S. 849, 106 S.Ct. 144, 88 L.Ed.2d 119 (1985).'"
Fields v. State, 582 So.2d 596, 597 (Ala.Cr. App.1991) (quoting State v. Betterton, 527 So.2d 743, 745 (Ala.Cr.App.1986), aff'd, 527 So.2d 747 (Ala.1988)). The test of whether *123 an encounter constitutes a "seizure" within the Fourth Amendment is whether the police engaged in a show of authority that would lead a reasonable person, innocent of any crime, to conclude that the person was not free to go under all the circumstances. United States v. Castellanos, 731 F.2d 979 (U.S.App.D.C.1984). Here, the record does not show that the officers made any display of force or show of authority when they approached the appellant. A request for identification cannot constitute a show of authority sufficient to convert an innocent encounter into a seizure. Id., at 983.
Given all the circumstances presented here, we do not believe that the presence of the officers together with the request for identification and other information would have led a reasonable person to conclude that he or she was being compelled to respond and was not free to leave. What we have here is a stop of a restricted investigative scope, conducted in a noncoercive manner. It did not amount to a seizure and, thus, did not trigger Fourth Amendment protections. We find that the actions of the police in this situation were neither arbitrary nor unreasonable. The officers had a legitimate investigatory purpose, i.e., to find the perpetrators of these crimes before they committed another, and the investigative intrusion was minimal. We note that the information obtained from the appellant played no part in the ultimate decision to arrest him. The officers did obtain his address, but that would have been ultimately discovered in any case. We find no plain error here.
The appellant contends that inculpatory statements to Lieutenant Ward and Officer Ricky Moore concerning the pistol used in the commission of the crimes should have been suppressed because the investigators delayed for a week in bringing him before a magistrate. He claims that this delay was intentional and done so that the investigators could interrogate him before he could consult with an attorney. He argues that the statements were obtained in violation of his Sixth Amendment rights because, he says, his right to counsel had attached by the time of his interrogation.
There is some question as to whether this issue was specifically raised in the trial court. If it was, it was raised in a very general way. In the appellant's motion to suppress, he stated, "The statement obtained from the defendant was the product of an unconstitutionally prolonged detention without presentation to a judicial officer." In another motion to suppress, he stated, "[C]ounsel was not appointed to represent the accused until September 2, 1981." He did not identify the statement he is referring to in his first motion, and the motions as well as the matter presented at the suppression hearing indicate that he was referring to the first and second statements or the confessions and not the statements made to Lieutenant Ward and Officer Moore about the pistol. Nevertheless, we will consider this issue as if it were properly and timely raised in the trial court and preserved for appellate review.
To support his contention, the appellant relies on Gerstein v. Pugh, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975), and Ala. R.Cr.P. 4.3(a)(1)(iii). Gerstein v. Pugh holds that, following a warrantless arrest, "the Fourth Amendment requires a judicial determination of probable cause as a prerequisite to extended restraint of liberty following arrest." 420 U.S. at 114, 95 S.Ct. at 863. Ala.R.Crim.P. 4.3(a)(1)(iii), which is known as the "48-hour rule," reads as follows:
"(1) A person arrested without a warrant:
"....
"(iii) Shall be afforded an opportunity to make bail in accordance with Rule 4.3(b)(3) and 4.4. A judge or magistrate in the county of arrest shall determine whether probable cause exists to believe that the defendant committed the charged offense, by examining any necessary witnesses in accordance with the procedures for making a probable cause determination provided in Rule 2.4. If the judge or magistrate finds that there is probable cause for the arrest of the person, a complaint shall promptly be prepared, filed, and served on the defendant, and the judge or magistrate shall proceed as provided in Rule 4.4 for initial appearance. If a probable cause determination is not made by a judge or *124 magistrate without undue delay, and in no event later than forty-eight (48) hours after arrest, then, unless the offense for which the person was arrested is not a bailable offense, the person shall be released upon execution of an appearance bond in the amount of the minimum bond set in Rule 2, A.R.J.A., and shall be directed to appear either at a specified time and place or at such time and place as he or she shall be subsequently notified of."
We note that Rule 4 was not in existence at the time of the appellant's arrest; it was adopted effective January 1, 1991.
The appellant was arrested at 10:30 p.m., August 27, 1981. His first statement was given to the police at 2:30 a.m., August 28, 1981, and his second statement was made at 9:00 p.m., on the same date. In these two statements, he confessed to the commission of the three crimes. His statements to Lieutenant Ward and Officer Moore, concerning the pistol, were made on August 31, 1981. The record indicates that counsel was appointed to represent the appellant on September 2, 1981, which would indicate that by that time he had appeared before a judge or magistrate. His first two statements came well within 48 hours of his arrest. The third, of course, did not. The appellant, in effect, urges us to adopt a per se rule that requires suppression of any evidence gained as a result of being detained in violation of the Fourth Amendment and Rule 4.3(a)(1)(iii). We have previously addressed this issue and have declined to adopt such a rule. Hammond v. State, 497 So.2d 558 (Ala.Cr.App.1986); Speers v. State, 545 So.2d 247 (Ala.Cr. App.1989); Taylor v. State, 589 So.2d 804 (Ala.Cr.App.1991).
The remedy for illegal pretrial detention, other than pretrial release, may be the suppression of any evidence obtained as a result of that illegal detentionnot the dismissal of the charges against the accused. Speers v. State. "[W]e follow the majority view and hold that a delay in presenting one arrested without a warrant to a judge for a probable cause hearing is one circumstance to be considered in determining the voluntariness of a statement given during the delay." Hammond v. State, 497 So.2d at 565. We have reviewed the totality of the circumstances surrounding the appellant's statements to Lieutenant Ward and Officer Moore concerning the pistol, including the circumstance of pretrial detention, and we find that they were voluntarily made, after proper Miranda warnings. We find no evidence of promises, threats, improper inducements, or coercion in the procurement of the statements. We find no evidence that the single factor of delay in providing the appellant with a probable cause determination before a judge or magistrate affected the voluntariness of his statements about the pistol. We conclude that those statements were not the product of any unlawful detention. Moreover, there is nothing in the record to support the appellant's assertions that the delay was intentional and for the purpose of interrogating him before he could consult an attorney.

XX.
The appellant contends that the trial court erred in admitting into evidence Holmes's description of the getaway automobile because, he argues, the description was highly unreliable and it was the product of improper suggestion by the police. Again, this issue was not raised in the trial court and we must, therefore, review it under the plain error rule. We find that Holmes's description of the getaway automobile was properly admitted into evidence, and the weight to be accorded it was for the jury to determine. There is no evidence in the record that the police influenced Holmes's description of the automobile by suggestions. As we have heretofore pointed out, it is understandable why Holmes experienced difficulty in remembering the events that occurred; however, he appeared to have no difficulty in remembering and describing the getaway automobile and, in fact, his description proved to be correct and helped lead to the discovery of the automobile. Within a matter of hours after the commission of the crimes, an automobile fitting the description given by Holmes was observed by the police parked, with its motor still warm, in front of Edward Pringle's home. This automobile turned out to be the automobile used by the appellant and his accomplice in the commission *125 of the crimes. We find no plain error in the trial court's admission of Holmes's description of the automobile.

XXI.
The appellant contends that the trial court erred in admitting the testimony of prosecution witness Patricia Pringle from the first trial of this case. He contends that its admission was improper because, he says, (1) the state allegedly failed to lay a proper predicate for the admission of the testimony by demonstrating that it had made a sufficient and diligent effort to locate the witness and procure her attendance at the trial, and (2) his trial counsel at his first trial was allegedly "constitutionally deficient as a result of his ineffectiveness and lack of access to crucial evidence that could have been used to impeach the witness." Because the state was unable to locate Mrs. Pringle and procure her attendance at the last two trials, her testimony from the first trial was read into evidence at the second and third trials. The appellant preserved this issue for review by timely objection in the trial court on the grounds stated above.
"`In Anderson v. State, Ala.Cr.App., 362 So.2d 1296, this court stated the general rule regarding the use of former testimony, as follows:
"`"Testimony of a witness, in a former trial or action, given (1) under oath, (2) before a tribunal or officer having by law the authority to take testimony and legally requiring an opportunity for cross examination, (3) under circumstances affording the party against whom the witness was offered an opportunity to test his credibility by cross-examination and (4) given in a litigation in which the issues and parties were substantially the same as in the present cause, is receivable as evidence in the present trial (5) when the personal attendance of the witness to testify in the present trial is not feasible."'
"Williams v. State, 375 So.2d 1257, 1269 (Ala.Crim.App.), cert. denied, 375 So.2d 1271 (Ala.1979). See also, C. Gamble, McElroy's Alabama Evidence § 245.07(1) (3rd ed. 1977)."
Nolen v. State, 469 So.2d 1326, 1328 (Ala.Cr. App.1985).
"In order for former testimony to be admissible in present litigation, proof must be made to the reasonable satisfaction of the trial judge that the personal attendance of the witness at court is not procurable or, if procurable, is ineffective, in consequence of legally recognized causes, to procure his testimony. The following cases of nonproduction of the witness have been held sufficient: that the witness is dead; that the witness is permanently or indefinitely absent from the state; that the witness cannot be found after diligent search; that the witness is in military service in time of war; that the witness is now ill and, in all probability, will never be able to testify again; that the opponent has caused the witness to be absent; that the witness is now insane; that the witness has become disqualified by facts occurring subsequent to the former trial if, but only if, the party now offering the former testimony is not responsible for such disqualification and that the witness now avails himself or herself of a privilege not to testify."
Gamble, § 245.07(8) (footnotes omitted).
"`A sufficient predicate for a determination of unavailability is laid when the party offering the evidence shows that it exercised due diligence in seeking the presence of the witness at trial to no avail. Williams v. Calloway, 281 Ala. 249, 201 So.2d 506 (1967); Miles v. State, 366 So.2d 346 (Ala.Crim.App.1978).' Napier v. State, 377 So.2d 1135 (Ala.Crim.App.), cert. denied, 377 So.2d 1138 (Ala.1979); Anderson, [362 So.2d 1296 (Ala.Crim.App.1978)]; Williams, supra. The sufficiency of the proof of the predicate of unavailability of an absent witness is addressed to the sound discretion of the trial judge. Anderson, supra; Williams, supra; Napier, supra."
Nolen v. State, 469 So.2d at 1328.
A subpoena was issued before the third trial ordering Ms. Pringle to appear as a witness for the state. An attempt was made by the Montgomery County Sheriff's Department to serve the subpoena at her last known address. The subpoena was returned *126 unserved because she had moved and had left no forwarding address. When it was learned that the subpoena had not been served, the state launched a search for her, which covered a period of approximately two weeks. An assistant district attorney, an assistant attorney general, two investigators, and a deputy sheriff in Pensacola, Florida, participated in the search. A search of the Alabama drivers' license records disclosed that she had surrendered her Alabama license and had been issued a driver's license in the state of Florida. Acting on reports that she had moved to Pensacola, where she was known to have relatives, a deputy sheriff in Pensacola, who knew her personally, searched for her in that area. He attempted, without success, to contact her through her known friends and relatives. He learned that she had not been seen in the Pensacola area for approximately six months before his search. He also checked the local hospitals and jails and was unable to find any trace of her. The records of the Alabama Department of Human Resources were checked for any record of her receiving public assistance of any kind, and no record was found. Her husband, Edward Pringle, was contacted in prison, as was her sister, Eunice Williams, in Pensacola, and her former employers in Montgomery, all to no avail.
After reviewing the evidence of the effort made by the state to locate Mrs. Pringle, we are convinced that she was in fact unavailable for trial. We find that the state made a good faith effort and exercised due diligence in seeking the presence of the witness at trial. The requirement for the use of former testimony was met in this case. The trial court did not abuse its discretion in determining that the proof of the predicate of unavailability was sufficient. We recognize that the state has a greater burden than showing that the witness was unavailable. However, in this case, that burden was met.
In Gamble, we find the following:
"The [general rule regarding the use of former testimony] is customarily categorized as an exception to the hearsay evidence rule. There are several exceptions which admit testimony rendered outside the courtroom upon the theory that such is necessary and reliable. The necessity which serves as the basis of the present rule is that the testimony will be entirely lost if it cannot be admitted in the subsequent proceedings. This evidence is trustworthy and reliable because the party against whom it is now offered had the opportunity to cross-examine the witness in the former proceeding."
Id. at § 245.07(2) (footnote omitted).
"The Confrontation Clause operates in two separate ways to restrict the range of admissible hearsay. First, in conformance with the Framers' preference for face-to-face accusation, the Sixth Amendment establishes a rule of necessity. In the usual case (including cases where prior cross examination has occurred), the prosecution must either produce, or demonstrate the unavailability of, the declarant whose statement it wishes to use against the defendant. See Mancusi v. Stubbs, 408 U.S. 204 [92 S.Ct. 2308, 33 L.Ed.2d 293] (1972); Barber v. Page, 390 U.S. 719 [88 S.Ct. 1318, 20 L.Ed.2d 255] (1968). See also Motes v. United States, 178 U.S. 458 [20 S.Ct. 993, 44 L.Ed. 1150] (1900); California v. Green, 399 U.S. [149] 161-162, 165, 167, n. 16 ... [90 S.Ct. 1930, 1936-1937, 1938-1939, 1939 n. 16, 26 L.Ed.2d 489 (1970) ]. (Footnote omitted.)
"The second aspect operates once a witness is shown to be unavailable. Reflecting its underlying purpose to augment accuracy in the factfinding process by ensuring the defendant an effective means to test adverse evidence, the Clause countenances only hearsay marked with such trustworthiness that `there is no material departure from the reason of the general rule.' Snyder v. Massachusetts, 291 U.S. [97], at 107 [54 S.Ct. 330, 333, 78 L.Ed. 674 (1934)]....
"....
"In sum, when a hearsay declarant is not present for cross-examination at trial, the Confrontation Clause normally requires a showing that he is unavailable. Even then, his statement is admissible only if it bears adequate `indicia of reliability.' Reliability can be inferred without more in a case where the evidence falls within a firmly *127 rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness."
Rouse v. State, 548 So.2d 643, 645-46 (Ala. Cr.App.1989) (quoting Ohio v. Roberts, 448 U.S. 56, 65-66, 100 S.Ct. 2531, 2538-2539, 65 L.Ed.2d 597 (1980)) (footnotes omitted). When a state's witness is unavailable and prior recorded testimony of the witness is admitted, the requirements of the Confrontation Clause are met if that prior testimony is marked with such truthworthiness that there is no material departure from the reason of the general rule, and if it bears indicia of reliability that would afford the trier of fact a satisfactory basis for evaluating the truth of the prior statement. Ohio v. Roberts; Mancusi v. Stubbs, 408 U.S. 204, 92 S.Ct. 2308,33 L.Ed.2d 293 (1972); Rouse v. State; Miles v. State, 366 So.2d 346 (Ala.Cr.App.1978).
Having found that the prosecution demonstrated the unavailability of the witness, Mrs. Pringle, we must now determine if her testimony is marked with the required truthworthiness and indicia of reliability. We conclude that it was. These indicia of reliability include the following: The witness was under oath; the testimony was taken before an officer having by law the authority to take testimony and to legally require an opportunity for cross-examination; the proceedings were in a court of record where the testimony was officially recorded; the testimony was taken under circumstances affording the appellant an opportunity to test the credibility of the witness by cross-examination; the testimony was taken in litigation where the issues and the parties are the same as in the present case; and the appellant was represented by competent counsel, as we discuss below. We find that the introduction in evidence at the present trial of Mrs. Pringle's testimony given at a prior trial of this case was constitutionally permissible under the Confrontation Clause. The admission of her testimony was proper under the unavailability hearsay exception.
In reference to the appellant's contention in a footnote to his brief to this court that the trial court erred in not allowing the jury to take the transcript of Mrs. Pringle's testimony to the jury room, we conclude that that argument is without merit. He also urges in a footnote that the transcript should not have been admitted into evidence because, he says, it was not certified. No objection was raised in the trial court concerning the authentication of the transcript; this issue is raised for the first time on appeal. We review it under the plain error rule and find no plain error. The appellant further contends that, in reading the transcript to the jury, the prosecutor unduly emphasized parts of the testimony by "voice inflection." The record does not support this contention, and we find no merit in it. In fact, at the time the transcript was read to the jury, the appellant raised no objection to the manner in which it was read.
We next review the appellant's contention that the testimony of Mrs. Pringle should not have been admitted because defense counsel was ineffective in his cross examination of her in the first trial. He contends that defense counsel in the first trial was ineffective in representing him, in regard to Mrs. Pringle's testimony, for the following reasons: He failed to cross-examine Mrs. Pringle about her possible bias to protect her husband; he failed to object to testimony from Mrs. Pringle that she spoke with the appellant after her husband had told her about the crimes, thus suggesting that Edward Pringle had implicated the appellant; when Mrs. Pringle had denied any knowledge of the gun or the charged crime, he made reference to a second gun used in another murder, thus leaving the jury with the impression that the appellant had been involved in an uncharged killing; and either he did not have the information about Holmes's identification of Cornelius Pringle in a lineup as the gunman in the Majik Market killing or he had it and failed to use it in cross-examination of Mrs. Pringle in order to show her motive to falsely implicate the appellant and shift the blame from Cornelius Pringle, her brother-in-law. He contends that defense counsel in the first trial did not have the information about Mrs. Pringle's having received some of the reward money and did not properly cross-examine her in reference to the offer of a reward. *128 Last, he contends that "because it was only after Mr. Bush's first trial that Edward Pringle was prosecuted and tried for the Seven-Eleven slaying and attempted murder of Tony Holmes, Mr. Bush's first attorney could not use this information about his involvement in the crime and his vulnerability to prosecution to cross-examine Mrs. Pringle and demonstrate her bias."
When the prior testimony of Mrs. Pringle was offered, the appellant made the following general objection:
"The defendant objects to the use of Patricia Pringle's prior testimony in the first trial in this case. In the first trial the defendant was represented by other counsel. As the Court knows the reason the case came back the first time was either Brady violation for the District Attorney's failure to turn over material information of exculpatory nature to the defendant, or because the first attorney that represented Mr. Bush was constitutionally ineffective under the Sixth, Eighth and Fourteenth Amendments. We object because use of this prior testimony would deprive the accused of his rights under the Sixth, Eighth and Fourteenth Amendments, because he would not be entitled to confront the witness with effective counsel. He was deprived of that opportunity the first time."
All the specific matters raised in the appellant's brief to this court, other than the matter pertaining to the exculpatory information, were never presented to the trial court and are presented here for the first time. For the issue of ineffective counsel to be cognizable in the trial court, it must contain "a clear and specific statement of the grounds upon which relief is sought, including full disclosure of the facts relied upon (as opposed to a general statement concerning the nature and effect of those facts)." Moore v. State, 502 So.2d 819, 820 (Ala.1986). Moreover, the Alabama Supreme Court has made clear that claims of ineffective assistance of counsel may not be considered for the first time on appeal. See Ex parte Jackson, 598 So.2d 895, 897 (Ala.1992) ("we will not make exception to the rule that a claim of ineffective assistance of counsel may not be considered on appeal if it was not first presented to the trial court"). Thus, these specific contentions made by the appellant, not having been presented to the trial court, must be reviewed under the plain error standard.
As we have previously stated, as a result of a habeas corpus proceeding in federal court, the parties entered into a stipulation pursuant to which the appellant was granted a new trial after his first conviction. This came about as a result of a dispute as to whether the prosecution had failed to turn over certain exculpatory information to the appellant before the first trial, or whether the information was turned over and defense counsel failed to use it. The question of who was at fault was not determined. Contrary to the appellant's assertion in his brief, the court did not find that defense counsel was ineffective nor did it find that the prosecutor had concealed evidence.
We have reviewed the testimony of Mrs. Pringle and particularly her testimony on cross-examination, and applying the plain error analysis, we do not agree with the appellant's contention that trial counsel was ineffective in his cross-examination. His questions substantially comported with the principal purpose behind the confrontation requirement by challenging the witness's veracity. More specifically, contrary to the assertions of the appellant, the cross-examination did address the possible bias of the witness against the appellant because of a possible desire to protect her husband, and also the possibility that her testimony was motivated by the hope of a reward. We note that Lieutenant Ward testified on cross-examination in this case that, on the day after the crimes, a $30,000 reward was offered for information about the crimes, and that this offer was given wide publicity throughout Montgomery. He also testified that Mrs. Pringle received a portion of the reward money. Thus, the jury had this information in the present trial to evaluate in deciding the weight and credibility to give the witness's testimony. Moreover, the appellant's counsel vigorously argued the particular issue of bias created by the receipt of reward money in his closing summation to the jury. The appellant's contention that trial counsel in the first trial could not have *129 used the information of Edward Pringle's involvement in the crimes and his vulnerability to prosecution in cross-examining Mrs. Pringle is not supported by the record. The cross-examination elicited the information from the witness that her husband, Edward Pringle, had been charged with the same crimes as the appellant. There was certainly evidence before the jury of the involvement of Edward Pringle in the commission of the crimes so that it could judge the possible bias of the witness in placing the blame for the killings on the appellant instead of on her husband. Of course, the appellant could have argued the possibility of such bias to the jury. In reference to the contention that the appellant was denied effective assistance of counsel because counsel did not have or did not use the information that Holmes had identified Cornelius Pringle as the gunman at a pretrial lineup to use in his cross-examination of the witness, we note that the jury in the instant case had that information for its consideration in weighing the credibility of Mrs. Pringle as well as that of Holmes. In reference to the remaining contentions that trial counsel was ineffective because he failed to object to testimony from the witness that she spoke with the appellant after her husband had told her about the crimes and because he asked a question concerning a second gun involving an unrelated incidence, we find no merit. We find no ineffectiveness of counsel in his cross-examination of the witness nor in his representation of the appellant. We attach no significance to the appellant's statement in brief that "recent revelations of other key information could have been used to destroy Patricia Pringle's testimony," because these "revelations" are not revealed either in his brief to this court or in the record of the trial.

XXII.
The appellant contends that the evidence was not sufficient to convict him of murder committed in the course of a robbery or an attempt thereof because, he argues, "it was undisputed that any theft of property from the Majik Market occurred as a mere afterthought following the killing." He argues that the theft of the zodiac sign tags was an afterthought and that it occurred after the shootings and when he was fleeing the scene. As discussed in Part XVII above, the fact that the victim was dead at the time the property was taken does not prevent a finding of robbery if the the murder and the taking were part of a continuous chain of events. Hallford v. State, 548 So.2d 526, 534-35 (Ala.Cr.App.1988), aff'd, 548 So.2d 547 (Ala.), cert. denied, 493 U.S. 945, 110 S.Ct. 354, 107 L.Ed.2d 342 (1989). A robbery committed as a "mere afterthought" and unrelated to the murder would not sustain a conviction for the capital offense of murder committed during the course of a robbery; however, the question of a defendant's intent at the time of the commission of the crime is usually an issue for the jury to resolve. Id.; Crowe v. State, 435 So.2d 1371, 1379 (Ala.Cr.App.1983). In the instant case, we find that sufficient evidence was presented to require that the question of the appellant's intent in killing Dominguez and in taking the zodiac sign tags be submitted to the jury. There was sufficient evidence from which the jury could reasonably infer that a robbery as charged in the capital indictment was committed. See discussion in Part XVII, below.

XXIII.
The appellant contends that the state failed to establish a proper chain of custody of the bodies of the victims Dominguez and Adams because, he argues, there was no showing of how, when, or from whom Dr. Gilchrist, the pathologist who performed the autopsies on the bodies, received them, thereby resulting in the state's failing to lay a proper predicate for Dr. Gilchrist's testimony. The appellant also contends that the state failed to prove that the bodies autopsied by Dr. Gilchrist were those of Dominguez and Adams. No objections were raised in the trial court concerning the chain of custody or the identity of the bodies, the condition of the bodies, or the manner in which the bodies were handled; hence, we review this issue under the plain error rule.
The appellant is correct is his assertion that there was no evidence presented as to how the bodies of the victims were transported *130 from the scenes of the crimes to the Montgomery office of the Alabama State Department of Forensic Sciences, where Dr. Gilchrist performed the autopsies.
"`The purpose for requiring that the chain of custody be shown is to establish to a reasonable probability that there has been no tampering with the evidence.' Ex parte Jones, 592 So.2d 210, 212 (Ala.1991); Harrell v. State, 608 So.2d 434, 437 (Ala. Crim.App.1992). Moreover, the evidence need not negate the remotest possibility of substitution, alteration, or tampering, but instead must prove to a reasonable probability that the item is the same as it was at the beginning of the chain. Id., at 437; Ex parte Williams, 548 So.2d 518 (Ala.1989). Evidence has been held correctly admitted even when the chain of custody has a weak or missing link. Gordon v. State, 587 So.2d 427, 433 (Ala.Crim.App.1990), rev'd, 587 So.2d 434 (Ala.), on remand, 587 So.2d 435 (Ala.Cr.App.), appeal after remand, 591 So.2d 149 (Ala.Crim.App.1991); Shute v. State, 469 So.2d 670, 674 (Ala.Crim.App.1984). In Gordon, this court held that because there was no evidence that the victim's body had been tampered with in any way, a sufficient chain of custody had been established. Gordon, 587 So.2d at 433."
Slaton v. State, 680 So.2d 879 (Ala.Cr.App.1995).
There is nothing in the record to suggest that the bodies had been tampered with or altered before arriving at the forensics laboratory where the autopsies were performed. In fact, the appellant does not allege that the bodies were tampered with or altered, nor does he advance any reason why he thinks he has been denied a substantial right or why the failure to show a chain of custody of the bodies has affected the fairness and integrity of the trial so as to rise to the level of plain error.
"After finding error, an appellate court may still affirm a conviction on the ground that the error was harmless, if indeed it was. Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); Sattari v. State, 577 So.2d 535 (Ala.Cr.App.1990), cert. denied, 577 So.2d 540 (Ala.1991); A.R.App.P. 45. The harmless error rule applies in capital cases. Ex parte Whisenhant, 482 So.2d 1241 (Ala.1983); Henderson v. State, 583 So.2d 276 (Ala.Cr. App.1990), aff'd, 583 So.2d 305 (Ala.1991), cert. denied, 503 U.S. 908, 112 S.Ct. 1268, 117 L.Ed.2d 496 (1992); Musgrove v. State, 519 So.2d 565 (Ala.Cr.App.), aff'd, 519 So.2d 586 (Ala.1986), cert. denied, 486 U.S. 1036, 108 S.Ct. 2024, 100 L.Ed.2d 611 (1988).... In order for a constitutional error to be deemed harmless under Chapman, the state must prove beyond a reasonable doubt that the error did not contribute to the verdict. In order for the error to be deemed harmless under Rule 45, the state must establish that the error did not or probably did not injuriously affect the appellant's substantial rights."
Guthrie v. State, 616 So.2d 914, 931 (Ala.Cr. App.1993). Although the state failed to establish a complete chain of custody of the victims' bodies and to lay a proper predicate, in this case we find that if it constituted error not to do so, it was harmless beyond a reasonable doubt, and it certainly did not rise to plain error. In our opinion, the failure of the state to prove a chain of custody of the victims' bodies did not contribute to the verdict nor did it injuriously affect the appellant's substantial rights.
We find no merit to the appellant's contention that error occurred when the state failed to prove that the bodies autopsied by Dr. Gilchrist were those of Dominguez and Adams. At the crime scenes, the victims were identified and photographs were made of them, which were introduced into evidence. Dr. Gilchrist also identified and photographed the bodies, and testified extensively about the injuries they sustained and the causes of their deaths. The identity of the bodies can hardly be questioned, and it is highly unlikely that anything occurred to the bodies that would cause one to question the accuracy and truthfulness of the findings of the pathologist. For the appellant to now claim after three trials and two appeals over a 14-year period that the bodies were not those of Dominguez and Adams is incredulous. There is no plain error here.

*131 XXIV.
The appellant contends that he was denied due process of law by allegedly improper prosecutorial argument and by a question asked a state witness on direct examination by the prosecutor. He avers several instances of allegedly improper comments in the closing argument to the jury.
In reviewing allegedly improper prosecutorial argument, it first must be determined if the argument was, in fact, improper. If the argument is determined to be improper, the test for review is not whether the comments influenced the jury, but whether they might have influenced the jury in arriving at its verdict. Ex parte Ward, 497 So.2d 575 (Ala.1986); Beecher v. State, 294 Ala. 674, 320 So.2d 727 (1975); Rutledge v. State, 523 So.2d 1087 (Ala.Cr.App.1987), rev'd and rem'd on other grounds, 523 So.2d 1118 (Ala.1988). When a prosecutor engages in conduct that deprives the defendant of a fair trial, due process is violated. Darden v. Wainwright, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986). Improper prosecutorial argument is reviewed in the context of the entire trial. United States v. Boyce, 797 F.2d 691 (8th Cir.1986). Prosecutorial misconduct is subject to a harmless error analysis. United States v. Martin, 815 F.2d 818 (1st Cir.), cert. denied, 484 U.S. 825, 108 S.Ct. 89, 98 L.Ed.2d 51 (1987); United States v. Boyce; Oliver v. Wainwright, 795 F.2d 1524 (11th Cir.1986), cert. denied, Oliver v. Dugger, 480 U.S. 921, 107 S.Ct. 1380, 94 L.Ed.2d 694 (1987).
The appellant contends that during the prosecutor's closing argument in the guilt phase of the trial, the prosecutor made the following allegedly improper comment on the appellant's failure to testify, thereby violating his constitutional rights: "This man told you in his own voice on that tape, and the State's evidence is uncontradicted."
In order to better understand this issue, we quote at length from the record to show what actually transpired when the comment was made and the objections were raised. The record shows the following:
"[MR. GRADDICK, prosecutor:] The defendant came down and gave a confession. The Police Department recorded that confession so that you could hear ten years ago that man right there (indicating) tell you what happened. The defense lawyer wants to suggest to you that the police were ugly to him when they did that. Maybe he raised his voice. I want to suggest to you that they didn't record four, five or six hours; they only recorded when he gave his confession. They wanted to suggest to you that they tried to educate this man so he then could regurgitate it back in some way of setting himself up to tell all of the facts. You heard it. This man told you in his own voice on that tape, and the State's evidence is uncontradicted.
"MR. GLASSROTH [defense counsel]: Object, Your Honor. I move for a mistrial. The prosecutor knows full wellMay I have this taken up outside the presence of the jury?
"....
"MR. GLASSROTH: Your Honor, at this time the defense moves for the court to declare a mistrial. The argument of the prosecutor was such that it was commenting upon the accused's failure to testify. When he says the evidence was uncontroverted, talking about what the evidence was, it was an unfair comment and unconstitutional comment on the right of the accused not to testify in the case. The prosecutor knows that and he did it.
"THE COURT: Have you got any law that says statements of evidence is uncontroverted?
"MR. GLASSROTH: I'm going by my gut more, Your Honor.
"THE COURT: I'm more interested in what the Appeals Court says than your gut. If you want me toI notice in the jury charge before the Court the Court explained in some detail that if the defendant didn't take the stand, he doesn't have to take the stand, no inference is to be raised. I can do that now if you want me to or wait and do it then.
"MR. GLASSROTH: Your Honor, I don't think any curative instruction can help.
"THE COURT: I'm not seeking to argue with you. The defendant is not to be prejudiced because he doesn't take the *132 stand. I plan to include that in my charge. If you would like I'll do that now, if you're asking for curative instruction.
"MR. GLASSROTH: I'm asking, Number One,
"THE COURT: I'm not going to grant a mistrial unless you show me some law that a comment such as that is prejudicial to the extent that a mistrial is required. I'm not sure that it's a comment.
"MR. GRADDICK: Judge, I was about to finish the statement about certain facts being uncontradicted, the State's evidence being uncontradicted concerning guns and everything else when he objected. I never even got close to talking about whether the defendant did or did not testify. I never even gotI mean that wasn't anywhere close to what I was getting ready to say. Plus the case law says the State of Alabama can comment on uncontroverted evidence in any criminal case.
"THE COURT: I'm going to charge them in my charge that the defendant did not take the stand, he doesn't have to, and no inferences are to be drawn from that. I'll go into that at some length, which I thinkBut if he shows me some lawI don't know. Y'all are telling me a lot about what y'all think about all of this. I'm more interested in what you can show me; but out of an abundance of caution, Mr. Graddick, don't go into uncontrovertedI don't know; but I've tried this case as many times as I want to.
"MR. GRADDICK: I understand.
"THE COURT: So I'll sustain his objection and I'm going to charge them at the conclusion about the defendant not taking the stand. I'll do this, I'll say this, Mr. Glassroth.
"MR. GLASSROTH: Yes, sir.
"THE COURT: If that's taken by them as any inference, any comment, that he did not take the stand, he doesn't have to take the stand, and they are not to consider that whatsoever the fact that he didn't take the stand. I'll say I'll tell you this now and I'll tell you again later on. Do you want me to do that?
"MR. GLASSROTH: Yes, sir, in absence of the Court granting a mistrial.
"THE COURT: All right, bring the jury back.
"....
"THE COURT: Ladies and Gentlemen, when the District Attorney had saidI don't think he had finished the sentence something about something being uncontroverted. Now, if from that comment would lead you to think that the defendant himself has any kind of responsibility to prove anything to you, that's not right. The defendant in this case does not have the responsibility to disprove anything. The burden is on the State to prove to you beyond a reasonable doubt that he is guilty. The law says a defendant does not have to prove anything, never has to prove anything. The burden never shifts from the State to the defendant to prove anything to you. I don't know what the District Attorney was getting to, or what the entire sentence would have been; but if any inference from that was an inference to you or anything that you might conclude that the defendant had a responsibility to prove anything to you or not prove anything to you, he does not. The law says he's presumed to be innocent. I'm going to tell you all of this again later on; but I'll give a little mini charge right now. The defendant is presumed to be innocent, and that innocence goes with him throughout the trial of the case and continues unless or until the State proves guilt beyond a reasonable doubt. The defendant doesn't have to prove anything. He does not have to get on the stand there himself and testify. And the law says if he does not testify you should not make any conclusion or draw any inference of guilt or prejudice him in any way at all because he doesn't testify. Now I sustain your objection and overrule your motion."
A defendant has the right not to take the witness stand and testify in his own behalf and, if he exercises that right, not to be the subject of comment by the prosecuting attorney. Griffin v. California, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965); Ex parte Purser, 607 So.2d 301 (Ala.1992); Whitt v. State, 370 So.2d 736 (Ala.1979); U.S. *133 Const. Amend. V, XIV; Ala. Const. 1901, Art. I, § 6; Ala.Code 1975, § 12-21-220. Section 12-21-220, in defining that right provides: "On the trial of all ... criminal proceedings, the person on trial shall, at his own request, but not otherwise, be a competent witness, and his failure to make such a request shall not create any presumption against him nor be the subject of comment by counsel."
"`Every time a prosecutor stresses a failure to present testimony, the facts and circumstances must be closely examined to see whether the defendant's right to remain silent has been violated.' Padgett v. State, 45 Ala.App. 56, 223 So.2d 597, 602 (1969), cert. denied, 284 Ala. 732, 223 So.2d 603 (1969). Thus, it becomes important as to whether the appellant alone could have provided the missing evidence. Id. at 603 (`in view of the testimony showing that only [defendant] and his co-defendant could deny the testimony ... [the prosecutor's remark that certain testimony was uncontradicted] did raise a danger that the jury would draw an improper inference from [defendant's] failure to take the stand').
"`In a case where there has been only an indirect reference to a defendant's failure to testify, in order for the comment to constitute reversible error there must be a close identification of the defendant as the person who did not become a witness. [ Ex parte ] Williams, [461 So.2d 852 (Ala.1984)]; United States v. Norton, 867 F.2d 1354, 1364 (11th Cir.), cert. denied, 493 U.S. 871, 110 S.Ct. 200, 107 L.Ed.2d 154 (1989).
"`....
"`Alabama law clearly holds that "where there is the possibility that a prosecutor's comment could be understood by the jury as reference to failure of the defendant to testify, Art. I, § 6 [Const. of Ala. of 1901] is violated." Ex parte Tucker, 454 So.2d 552, 553 (Ala. 1984); Ex parte Dobard, 435 So.2d 1351, 1359 (Ala.1983), cert. denied, 464 U.S. 1063, 104 S.Ct. 745, 79 L.Ed.2d 203 (1984) (quoting Beecher v. State, 294 Ala. 674, 682, 320 So.2d 727, 734 (1975)). However, as asserted by the State here, the prosecutor does have the right to point out to the jury that the State's evidence does stand uncontradicted and [to] an appropriate comment to that effect, but the comment must not cross over the line drawn by the right of a defendant not to testify at trial. [Citations omitted.]'"
Windsor v. State, 593 So.2d 87, 91 (Ala.Cr. App.1991) (quoting Ex parte Wilson, 571 So.2d 1251, 1261-63 (Ala.1990)). "[I]t is generally held that a comment referring to the State's evidence as uncontradicted refers to the defendant's failure to testify, where the defendant himself is the only person who could or would have contradicted the evidence...." Pittman v. State, 462 So.2d 791, 793 (Ala.Cr.App.1984). Where there has been a direct comment on the defendant's failure to testify or an indirect comment with a close identification of the defendant as the person who did not become a witness and the trial court does not act promptly to cure the comment, the defendant's conviction must be reversed. Ex parte Purser. A reversal may be prevented if the trial court sustains an objection to the improper remark and promptly and appropriately instructs the jury as to the impropriety of the remark. Ex parte Wilson, 571 So.2d 1251 (Ala.1990). In determining whether the curative instructions eradicated the prejudice caused by the improper remark, we must consider each case on its own facts. Whitt v. State. The "type of remark ... whether promptly objected to, and the appropriateness of the trial judge's instructions" shall be considered. Id., 370 So.2d at 739.
In this case, the state alternatively contends that the remark was not a comment on the appellant's failure to testify, but if it was, that it did not constitute reversible error because the trial court sustained an objection to it and gave prompt and appropriate curative instructions which eradicated any possible prejudice. The remark was preceded by the comment on the appellant's position that the statements were coerced and that the officers told him what to say and forced him to adopt the statement as his own. This was a fair comment on the evidence. The important question here is whether the portion of *134 the comment, "This man told you in his own voice on that tape, and the State's evidence is uncontradicted," raises a danger that the jury might have drawn an improper inference from the appellant's failure to take the stand. We find that, at most, the remark was an indirect comment on the failure of the appellant to testify. Thus, the question became whether the appellant alone could have provided the missing evidence. When there are other possible witnesses to refute the state's evidence, an argument that the state's case is uncontradicted does not focus the jury's attention on the defendant's failure to testify. Here, the only witnesses in the room with the appellant when he made his confessions were the two police officers who conducted the interrogation. Thus, the only person the jury could have expected to refute the state's evidence pertaining to the voluntariness or truthfulness of the confessions was the appellant. See Ex parte Williams, 461 So.2d 852 (Ala.1984).
Assuming arguendo that the remark was an improper comment on the failure of the appellant to testify, we find that the trial court's curative instruction was prompt and appropriate and sufficient to vitiate any impropriety in the prosecutor's comment. It substantially complied with the requirements of Whitt v. State. We are of the opinion that, in view of the curative instruction, the comment could have in no way contributed to the appellant's conviction. The trial court's denial of the motion for a mistrial was proper.
The appellant contends that the prosecutor, in questioning Lieutenant Ward, improperly suggested to the jury that the codefendant, Edward Pringle, had identified the appellant as the triggerman. The record shows the following:
"Q. [MR. BELSER, prosecutor:] Did Edward Pringle ever finger the defendant over here, William Bush?
"MR. GLASSROTH: Object, Your Honor; out of court statement offered for proving the truth of the matter asserted. It's hearsay.
"THE COURT: I sustain.
"MR. BELSER: Nothing further, Your Honor."
The appellant argues that the question, even though it went unanswered, conveyed to the jury that Lieutenant Ward "knew and would have told them that Edward Pringle identified Mr. Bush as the triggerperson, had defense counsel not `hidden' this information from them." He argues that the question itself corroborated the appellant's inculpatory statements and strengthened the state's case. We do not agree. There was no adverse ruling by the trial court. Thus, we must review this issue under the plain error rule. The appellant must not have felt unduly prejudiced at the time because he did not ask for a mistrial or for curative instructions. The appellant's conclusions as to the possible effect of the question are based on pure speculation; there is nothing to suggest that the question might have influenced the jury in arriving at its verdict. We find no plain error in this contention.
The appellant contends that the prosecutor erred in urging the jury in his closing argument to find the appellant guilty out of sympathy for Holmes's suffering. We have reviewed the prosecutor's argument in this regard, and find no reversible error. His comments in reference to Holmes were based on the evidence and were legitimate inferences to be drawn therefrom.
The appellant contends that the prosecutor erred in arguing to the jury in the guilt phase that he had personal knowledge that the appellant was guilty. The record shows the following:
"There's no way for the Code of Alabama to say deep down in this stomach right here if you believe the man did it find him guilty. That's what the law saysreasonable doubt. If you have a reason down in here (indicating) to turn him loose, walk him out the door, because I'll tell you David Belser or Paul Copeland, or anybody in our D.A.'s Office, don't want to put anybody that we feel is innocent in jail; and I know you don't."
A prosecutor may not express his personal opinion of an accused's guilt or state that he has personal knowledge of guilt. Arthur *135 v. State, 575 So.2d 1165 (Ala.Cr.App. 1990), cert. denied, 575 So.2d 1191 (1991); Davis v. State, 494 So.2d 851 (Ala.Cr.App. 1986). No objection was raised in the trial court to the comment set out above. After reviewing the comment, we conclude that it was not an expression of the prosecutor's personal opinion of the appellant's guilt or a statement that he had personal knowledge of such guilt. We find no plain error in this portion of the prosecutor's argument.
The appellant also contends that the following was error:
"And then once you collectively have decided that right down here (indicating) you know he did it, and I know he did it.
"MR. GLASSROTH: Object, Your Honor; improper comment by the prosecutor
"THE COURT: About what he knows.
"MR. GLASSROTH: That's right. I move for a mistrial.
"THE COURT: Overrule on the mistrial and sustain your objection."
The appellant did not request curative instructions nor were any given. We consider this comment, "I know he did it," in the context of the entire trial. Literally, it can be taken as the prosecutor's personal opinion of the guilt of the appellant, which was improper, or it also can be taken in the context of mere rhetoric. We believe that the comment was an improper expression of the prosecutor's personal opinion of the guilt of the appellant. However, we do not believe that it tended to convey to the jury that the prosecutor based his opinion on evidence outside that presented at trial. Having determined that the comment was improper, we must decide whether, in the light of the entire record, it might have influenced the jury in arriving at its verdict and, thus, might have deprived the appellant of a fair trial.
We first note that the trial court did sustain the objection to the comment. It of course would have been better if the trial court had given a cautionary instruction to the jury immediately after the comment was made. However, we still find that the improper comment had no effect on the jury nor did it result in prejudice when considered along with the appellant's other assertions of prosecutorial misconduct. We further find that the overwhelming evidence against the appellant mitigates against a conclusion that the comment might have influenced the jury in arriving at its verdict or that it contributed to the verdict. We find that due to the lack of any prejudice caused by the comment, the overwhelming evidence of guilt of the appellant, and the manner and context in which the comment was made, the comment was harmless beyond a reasonable doubt and did not injuriously affect a substantial right of the appellant.
"Even though a trial court's ruling on a motion for a mistrial is reviewable on appeal, Stennett v. State, 340 So.2d 65 (Ala. 1976), rulings on mistrial motions are within the discretion of the trial court; they will not be reversed in the absence of a clear abuse of discretion. Ex parte Jefferson, 473 So.2d 1110, 1114 (Ala.1985), cert. denied, 479 U.S. 922, 107 S.Ct. 328, 93 L.Ed.2d 300 (1986). `The entry of a mistrial is not lightly to be undertaken.... The entry should be only a last resort, as in cases of otherwise ineradicable prejudice.' Leverett v. State, 462 So.2d 972, 978 (Ala.Cr.App.1984)."
Cole v. State, 548 So.2d 629, 630 (Ala.Cr.App. 1989). Under the circumstances here we do not believe that the granting of a mistrial would have been proper, and we find that the trial court did not abuse its discretion in overruling the motion.
The appellant contends that error occurred when the prosecutor asked the jury in closing argument in the guilt phase to imagine themselves as the victims. His comments in this regard are as follows:
"What kind of chance did Larry Dominguez have? What kind of chance does Tony Holmes have now in life? I wrote down, he says it wasn't pleasant, `This wasn't pleasant.' I ask you what is one of the worst nightmares you can imagine? If you're standing in a Majik Mart, or Zippy Mart, or one of these convenience stores that we hear about all the time, you're standing there buying half a gallon of milk and some dope-crazed criminal comes in with a gun and he doesn't care what your *136 name is, he doesn't care what you do for a living, he doesn't care at all. He takes you back to some dirty restroom in the back of the building and blows you in the face with a gun. Is that pleasant? No, it's not pleasant. It's not pleasant for poor Tony Holmes to leave this courtroom here today."
Again, no objection was raised to these comments in the trial court; hence, we must review them under the plain error rule. The failure to object weighs against any claim of prejudice. Kuenzel v. State, 577 So.2d 474 (Ala.Cr.App.1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991). After reviewing the comments, we cannot conclude that they did or probably did adversely affect a substantial right of the appellant or that the comments seriously affected the fairness or integrity of the proceedings. We find that these comments by the prosecutor did not constitute plain error.

XXV.
In accordance with Ala.R.App.P. 45A, we have examined the record in this case for any plain error, whether or not brought to our attention or to the attention of the trial court. We have found no "plain error or defect in the proceedings," either in the guilt phase or in the sentencing phases of the trial.
We have also reviewed the appellant's sentence pursuant to § 13A-5-53, which requires that, in addition to reviewing the case for any error involving the conviction, we also review the propriety of the death sentence. This review shall include a determination of the following: (1) whether any error adversely affecting the rights of the appellant was made in the sentence proceedings; (2) whether the trial court's findings concerning the aggravating and mitigating circumstances were supported by the evidence; and (3) whether death is the appropriate sentence in the case. Section 13A-5-53(b) requires that, in determining whether death is the proper sentence, we must determine: (1) whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; (2) whether an independent weighing by this court of the aggravating and mitigating circumstances indicates that death is the proper sentence; and (3) whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the appellant.
After the appellant was convicted of the capital offense charged in the indictment, a separate sentence hearing was held before the jury in accordance with §§ 13A-5-45 and -46. After hearing evidence concerning the aggravating and the mitigating circumstances, after being properly instructed by the trial court as to the applicable law, and after being correctly advised as to its function in finding aggravating and mitigating circumstances and in weighing those circumstances, if appropriate, and as to its responsibility in reference to the return of an advisory verdict, the jury, by a unanimous vote, returned a verdict recommending that the appellant be sentenced to life imprisonment without the possibility of parole.
Thereafter, the trial court held another hearing, in accordance with § 13A-5-47, to determine whether it would sentence the appellant to death or follow the jury's recommendation and sentence him to life imprisonment without the possibility of parole. The trial court ordered, received, and considered a written presentence investigation report, as required by § 13A-5-47(b). After the hearing, the trial court entered specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in § 13A-5-49 and the existence or nonexistence of each mitigating circumstances specified in § 13A-5-51. The trial court also made specific written findings concerning mitigating circumstances that it found to exist in accordance with § 13A-5-52. It also made specific written findings of fact summarizing the crime and the appellant's participation in it as required by § 13A-5-47(d). In its findings of fact, the trial court found the existence of the following aggravating circumstances: (1) that the capital offense was committed while the appellant was engaged in or was an accomplice in the commission of a robbery (§ 13A-5-49(4) and § 13A-5-50); (2) that the appellant *137 was previously been convicted of the offense of robbery, a felony involving the use or threat of violence to the person, in March 1970 (§ 13A-5-49(2)); and (3) that the capital offense was especially heinous, atrocious, or cruel when compared to other capital offenses (§ 13A-5-49(8)). The trial court examined the evidence for mitigating circumstances, pursuant to §§ 13A-5-51 and -52. It did not find the existence of any of the mitigating circumstances specified in § 13A-5-51, but did find, under § 13A-5-52, the existence of the following mitigating circumstances: (1) that the appellant is a productive member of society; (2) that while in prison he has shown remorse for his crime; (3) that his life is of value; (4) that he has had a spiritual conversion during the last two years that has made a difference in his life; and (5) that while in prison he has done artwork that reflects his worth as a human being.
Thus, the trial court found the existence of three aggravating circumstances and five mitigating circumstances. It considered the presentence report along with the advisory verdict of the jury and weighed the aggravating circumstances against the mitigating circumstances, and finding that the aggravating circumstances outweighed the mitigating circumstances, sentenced the appellant to death.
We take judicial notice that crimes similar to the crime committed by the appellant in the instant case are being punished capitally throughout this state. See, e.g., Kuenzel v. State; Hallford v. State; Hinton v. State, 548 So.2d 547 (Ala.Cr.App.1988), aff'd, 548 So.2d 562 (Ala.1989), cert. denied, 493 U.S. 969, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989). In fact, two-thirds of Alabama's death sentences have been imposed on defendants convicted of capital murder arising out of robbery-murders. Beck v. State, 396 So.2d 645, 654 n. 5 (Ala.1980); Kuenzel v. State.
We have carefully searched the record of both the guilt and the sentence phases of the appellant's trial, and we have found no error warranting reversal. In reviewing the sentence, we find no evidence that the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor. The findings and conclusions of the trial court are supported by the evidence. We concur in the judgment of the trial court that death is the appropriate sentence in this case. Our independent weighing of the aggravating circumstances and mitigating circumstances convinces us that the sentence of death is appropriate for this appellant. Considering the crime committed and considering the appellant, we find that the sentence of death is neither excessive nor disproportionate to the penalty imposed in similar cases.
Accordingly, the appellant's conviction and sentence of death are due to be, and they are hereby, affirmed.
AFFIRMED.
All Judges concur.

On Application for Rehearing
PATTERSON, Judge.
The appellant, William Bush, filed an application for rehearing on December 15, 1995, and a brief in support thereof on January 16, 1996. We have carefully reviewed the appellant's application and his brief, and we conclude that he has not raised any issue that we have not considered or addressed in our opinion affirming his conviction and sentence. Bush v. State, 695 So.2d 70 (Ala.Cr.App. 1995). Therefore, we are not persuaded to alter our holding. The application for rehearing is overruled.
Further, we find no reason to supplement or correct the statement of facts in our opinion. We decline to adopt the appellant's proposed statement of facts as he requests. The Ala.R.App.P. 39(k) motion is denied.
OPINION EXTENDED; APPLICATION FOR REHEARING OVERRULED; MOTION DENIED.
All Judges concur.
NOTES
[1] This action was precipitated by a conflict over whether the prosecution had given to the defense a police memorandum showing that the only eyewitness to the capital murder had identified a person other than the appellant as the assailant. It was conceded that if this exculpatory information had been turned over to trial counsel, counsel's failure to develop it at trial would have constituted a Sixth Amendment violation, and if it had not been turned over, it would have constituted a Fifth Amendment violation. On these alternative bases, a new trial was ordered.
[2] Edward Lewis Pringle was convicted of capital murder February 17, 1982, in Case No. 81-1350 in the Circuit Court of Montgomery County, Alabama, and was sentenced to life imprisonment without parole on March 9, 1982. Case No. 81-1350 involved the murder of Andy Adams during the robbery of the Seven-Eleven store on Narrow Lane Road in Montgomery, Alabama. The case was not appealed. He was convicted of attempted murder in Case No. 81-1351, and was sentenced to life imprisonment without parole as a habitual offender on May 6, 1982. Case No. 81-1351 involved the murder of Larry Dominguez and the shooting of Tony Holmes during the robbery of the Majik Market store on Carter Hill Road in Montgomery, Alabama. The judgment in that case was appealed to this court, and we affirmed without opinion, Pringle v. State, 428 So.2d 1380 (Ala.Cr.App.1983) (table).
[3] The admissibility of the evidence of the collateral capital murder offense is discussed below. When we refer to the offense underlying the conviction under review in this appeal, we will designate it as "the charged" offense; when we refer to the collateral crime, we will specify it as collateral; when we refer to capital murder "crimes" or capital murder "offenses," we will be referring to both capital murder offensesthe charged one and the collateral one; and finally, when we refer to the three "crimes" or the three "offenses," we will be referring to the two capital murder crimes/offenses and the attempted murder of Holmes.
[4] While the appellant did not question the certification of the court record of the conviction, we note that it is not certified. The certification was either overlooked or waived by the appellant; however, under the circumstances here, the lack of certification does not affect our opinion.
[5] The appellant contends the state struck 19 blacks; however, the trial court concluded that the state struck 18 blacks. This confusion is readily apparent from the trial court's written order. The court, in its order, notes reasons given by the prosecutor for striking 18 blacks. However, his order does not include the prosecutor's given reason for striking G.R. (188-A), a black female. Thus, if we considered the court's number of 18 to be correct, along with the black veniremember not noted as having been struck by the prosecution, the number of blacks struck by the state would actually be 19. However, one of the venirepersonsM.J. (116)denoted by the prosecutor and assumed by the trial court to be black is actually white, according to the master list. Thus, the trial court's conclusion that the state struck 18 blacks is correct even though the information upon which the trial court based its finding of the number was incorrect.
[6] The trial court failed to include the prosecution's reasons for striking of G.R. in its litany of findings pertaining to the prosecutor's exercise of his strikes. However, in reviewing the state's strike of G.R., we look to the reason given by the prosecutor in the hearing, which is as follows:" "The next strike was No. 188-A, black female. `What is your opinion about capital punishment?' She answered, `disagree.' `Do you think it deters crime?' `No.' She checked capital punishment has never been effective in preventing crime."
[7] We note that the Alabama Supreme Court has granted a petition for a writ of certiorari in May v. State, 672 So.2d 1307 (Ala.Cr.App.1993), in which this same issue was addressed by this court. That case is pending review in the supreme court.